(No. 20622.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SIMON MARQUIS, Plaintiff in Error.

*Opinion filed April 23, 1931—Rehearing denied June 4, 1931.*

TRUMAN A. SNELL, and JESSE PEEBLES, for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, VICTOR HEMP-HILL, State's Attorney, JOHN P. MADDEN, and MICHAEL F. SEYFRIT, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Simon Marquis was indicted by the grand jury at the September term, 1930, of the circuit court of Macoupin county for the murder of his son, Fred Marquis, on June 1, 1930, by shooting him with a revolver. Defendant was tried

before a jury at the same term of court, and a verdict was returned finding him guilty, that he was fifty-one years of age, and fixing his punishment at imprisonment in the penitentiary for twenty-five years. The court overruled a motion for a new trial and rendered judgment on the verdict, sentencing defendant to the Southern Illinois penitentiary at Chester. He has sued out this writ of error to review the record.

Defendant worked in the mines at Staunton when the mines were being operated and at other times engaged in different kinds of labor. The mines were not operating at the time of the homicide, and he and two of his sons, Simon, aged eighteen years, and Fred, twenty years old, were cutting coal-props and making ties in the timber about seven miles from the city of Staunton, where defendant and his family lived. They did not return home from work every night but remained at their camp in the timber and came home on week ends. The shooting occurred June 1, 1930, which was Sunday, about one o'clock in the afternoon, in the dining room of defendant's home. Defendant had a wife and six children living at his home in Staunton. He came home from the timber camp a day or so before deceased and his brother returned for the week end. The father drank rather heavily at times and when drinking was quarrelsome with the boys. When the boys came home Saturday afternoon he complained of the amount of work his sons had done in the timber after he left them, and he told them he could do more himself. The sons did not quarrel with him but in defendant's anger he struck deceased once or perhaps twice. Defendant had been drinking beer and whisky on Saturday and Sunday. On Sunday afternoon, while in the Marquis kitchen, he told deceased if he would not work to get out, and the son said he would. The son then went out of the kitchen, across the porch and into the dining room and was followed there very shortly by his father. The coats and clothing of the son were in

the dining room. Defendant said he followed his son into the dining room to get the tools and provisions he needed, for the purpose of taking them to his working place in the timber. He testified he was in the habit of taking a revolver with him to camp to protect the workmen against theft in the timber, and the coats and hats were hanging in the dining room, where he went to get them before the shooting occurred. He and his son Fred were the only persons in the dining room and no one but they saw what happened or how it happened. Defendant testified the son, while in the dining room, grabbed defendant from behind, jumped on him and threw him down upon his hands and knees and upon his belly, and that while his son was on top of him, the revolver, which was in defendant's right hip-pocket, was in some manner discharged and mortally wounded the son; that when the revolver was discharged and the bullet hit the son he rolled off of defendant; that defendant arose, picked up the gun and left the house; that he did not have the gun in his hand before the shooting; that he could not get it from his pocket and did not try to get it; that he did not know whether the son took it out of defendant's pocket or whether it fell out, but he insisted that he did not do the shooting. Immediately following the shooting he went out of the dining room to the kitchen and thence to a vacant house located a short distance away and which his family owned, and from there to an open field, where he was arrested by the chief of police. The bullet entered the son's body at the base of the neck on the right side, above the collar bone. The wound was not probed and the bullet did not come out of the body. The deceased said nothing after the shooting.

A daughter of defendant, Mrs. Helen Hand, who was almost fifteen years old when the homicide occurred, testified that after the shot was fired and when defendant came out of the door to the kitchen she asked him why he did that, and he replied, "I told you I would do that some day

and I am going to kill another one before I die." There was evidence of good reputation of defendant, but it is fairly clear that he was an excessive drinker and was quarrelsome to at least some members of the family when in that condition. He was the only person alive who saw and knew what occurred between him and deceased at the time of the shooting.

In support of defendant's motion for a new trial he filed the affidavit of Helen Hand, his daughter, which recites that she testified as a witness on the part of the People. She says she testified to the same thing before the grand jury, but states that it is a fact she did not ask her father the question she testified to on the occasion of the shooting and he did not tell her that he had told her he would do that and that he would kill somebody else, too, before he died. She said in her affidavit that defendant did not say what she testified to or use language like it. The affidavit states that affiant was fifteen years of age the 8th of August, 1930; that she became pregnant in the latter part of the year 1929 by a man whom she has since married; that she quit school by request in the month of April, 1930, and that she was greatly frightened and distracted because she feared the wrath of her father when he found out the name of the man who was responsible for her condition; that she was also frightened at the prospect of approaching motherhood, and the dread and fear of her father if he should learn the name of the man responsible for her condition she believed caused her to become partially deranged; that she married the father of her child the 16th day of June, 1930, when she was fourteen, but her husband refused to live with her as his wife; that her baby was born in August, 1930, and died soon thereafter. She made the affidavit in October, 1930, and states therein that she is just beginning to remember and to visualize matters and things as they took place; that she does not believe, up to the time of making the affidavit, she understood all that took place, but states therein that

she did not ask her father immediately after the shot was fired and as he came out of the house why he had done that thing, and he did not state to her that he intended to kill her brother and did not tell her he would kill someone else before he died. The affiant states that the effect of her testimony as given upon the trial had been explained to her, and that she now remembers the facts more clearly and believes that because of her fear and dread of having trouble she almost lost her reason, and that if she made the statements she testified to on the trial they were made because of dread of her pregnant condition and the state of her mind induced by those causes. The action of the court in overruling the motion for a new trial, supported by the affidavit of Helen Hand, is urged as ground for reversal.

Recantation by a witness of his testimony on a trial does not necessarily entitle a defendant to a new trial. Recanting testimony is regarded as very unreliable, and a court will usually deny a new trial based on that ground where it is not satisfied that such testimony is true. Especially is this true where the recantation relied on involves a confession of perjury. The recanting testimony of witnesses will not ordinarily be regarded as sufficient ground for a new trial except in extraordinary and unusual cases. (33 A. L. R. p. 550, note.) The affidavit of a recanting witness is not entitled to so much weight as to justify the conclusion that the evidence given by him was corrupt and willfully false. The conclusion of the jury would rather warrant the presumption that his testimony was truthful and his affidavit false. Those experienced in the administration of criminal law well know the untrustworthy character of recanting testimony. (*People* v. *Shilitano*, 112 N. E. (N. Y.) 733.) If the recantation be accepted as true, the remaining proof in the record shows the deceased was shot when no one was in the room with him and his father; that immediately after the shot was fired his father came out of the room, left his son dying, and made no statement to anyone else

in the house that it was an accident or expressed any sorrow or regret at the occurrence. That would be a most unnatural act on the part of a father who had nothing to do with the shooting. He walked out of the house immediately after the shot was fired, said nothing to anyone according to Helen Hand's affidavit in support of the motion for a new trial, went some little distance to a vacant house that belonged to his family, and then walked out of that and into a pasture and started walking across the pasture. The police, who had been notified, came and saw defendant walking across the pasture or field. The policeman testified defendant was walking a little faster than a moderate step and was more than a hundred yards away when he first saw him; that he called to him, "Halt there!" that defendant looked around, saw who witness was, and told him to come on and get him and that he was not afraid of anybody; that witness asked him if he had a gun, and he said yes; that he searched defendant and took the gun away from him; that it had two empty shells and three loaded cartridges in it, two of which had been snapped and had not discharged.

The mortal wound of deceased was at the base of the front of the neck, just above the collar bone and a little to the right side. There was no evidence of any powder-burns about the wound. Defendant testified that at the time the shot was fired he was on his face on the floor and his son was on his back with his arms around defendant's shoulders. They were approximately the same height. The gun in the pocket was pointing in the opposite direction from the neck of the deceased. It is very difficult to conclude that the gun came out of defendant's pocket, in which it was pointing in the opposite direction from where deceased was shot, and that it turned around and was fired in the direction of deceased's neck. It is worthy of note, also, that defendant made no mention of the accident nor did he express any sorrow for it but walked away from his house.

We do not consider the court erred in overruling the motion for a new trial on the ground of Helen Hand's affidavit.

It is contended by defendant that the court erred in refusing to permit Dr. W. L. McBrian to answer the questions asked him relative to the defendant's mental capacity being similar to that of a child of twelve years. There is no merit in this alleged error. Criminal responsibility depends upon whether the accused knows the difference between right and wrong, can understand his relation to others and that which others bear to him, and has knowledge of the nature of his act so as to perceive its consequences to himself and others. (*Commonwealth* v. *Stewart,* 151 N. E. (Mass.) 74.) A sub-normal mentality is not a defense to a charge of crime unless the accused is by reason thereof unable to distinguish between right and wrong with respect to the particular act in question. 44 A. L. R. p. 586, note; *Patterson* v. *People,* 46 Barb. (N. Y.) 625.

Defendant contends that the court erred in not giving instructions offered by him. We do not think this assignment of error requires a discussion of the refused instructions in detail. Some of them were argumentative and others were covered by instructions given. We find no error in the instructions given or refused which could possibly have prejudiced or injured defendant.

Defendant argues that the proof of good reputation made for him raises a reasonable doubt as to his guilt. The proof of good reputation shows that when he was sober he was a man of good reputation, supported his family, paid his debts, but that he drank excessively, and, as some of the witnesses expressed it, he was his own worst enemy in that regard.

We cannot say that there was any reasonable doubt about the proof of defendant's guilt. He had been drinking and was quarreling with his son just before the shot was fired that killed him, and he also previously assaulted the deceased. The record does not disclose that the deceased

quarreled with his father at any time or resented the blows which he received, except as recited by defendant when they were in the dining room by themselves.

There is no prejudicial error in this record which requires a reversal of the judgment, and it is affirmed.

*Judgment affirmed.*