THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SALVATORE ROSA, Defendant-Appellant.

First District (2nd Division)    No. 62291

Opinion filed May 24, 1977.

Rick Halprin, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Iris E. Sholder, and Edward D. Stern, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendant, Salvatore Rosa, was charged by indictment with the offense of armed robbery in violation of section 18—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1969, ch. 38, par. 18—2). Upon a jury trial defendant was found to be guilty as charged. Judgment was entered on the verdict and defendant was sentenced to serve a term of confinement of 3 to 6 years in the Illinois State Penitentiary.

From entry of the judgment of conviction defendant appeals contending (1) that the trial court erred in precluding defendant from introducing into evidence testimony regarding crimes other than that charged in the instant indictment; (2) that the trial court erred in refusing to compel the production of a composite drawing; (3) that certain remarks by the trial court to the jury constituted improper instruction; and (4) that certain statements by the prosecution in its closing argument were improper and served to deny defendant a fair trial.

A review of the evidence adduced in the case at bar reveals that at approximately 2:30 p.m. on July 3, 1970, a lone gunman entered the Archer-Cicero Currency Exchange located at 6354½ South Archer Avenue in Chicago, Illinois. While holding a customer hostage and at gunpoint, the assailant passed a handwritten note to the teller, Marcy Schuth. The note read, "I want $3000. Hurry and no one will get hurt." Thereafter, apparently alarmed at the slow pace at which the robbery was progressing, the gunman ordered Schuth to "Hurry up" or he would shoot the hostage. Schuth complied with his demands and the robber fled the scene. Police assistance was summoned and the holdup note was recovered and delivered to the Chicago Crime Laboratory for analysis.

Schuth testified that at the time of the robbery the currency exchange was illuminated by several fluorescent lights and that during the course of

the 8-10 minutes required to complete the robbery she enjoyed an unobstructed view of the gunman's facial features from a distance of 3-4 feet. Schuth described the gunman as a clean-shaven male caucasian, 25-30 years of age, approximately 6 feet tall, weighing 180-200 pounds and sporting brown hair and eyeglasses.

Approximately 6 months after the robbery, Schuth viewed a police lineup and, based upon her observation of his physical appearance as well as his voice characteristics, identified defendant, Salvatore Rosa, as the man who had robbed her place of employment on July 3, 1970. It appears that prior to the date of this lineup Schuth also had occasion to view 400-600 police photographs as well as a composite drawing of an individual wanted in connection with other currency exchange robberies. However, Schuth had been unable to identify the perpetrator by these procedures.

During the course of their investigation, the Chicago Police Department subjected the aforementioned holdup note to both handwriting and fingerprint analysis. Within the former context, David J. Purtell, an expert in the field of document identification, testified that based upon his prior experience and his examination of the note in comparison with an exemplar of defendant's handwriting, he was of the opinion that both documents had been prepared by the same hand. During cross-examination, defense counsel presented Purtell with three additional notes which had apparently been prepared and utilized in other robberies. Purtell indicated that he had previously compared these notes with that recovered from Mary Schuth and concluded that all four had been prepared by the same individual.

Officer Joseph Mortimer of the Chicago Police Department, an expert fingerprint technician, testified that he had occasion to examine the Schuth note for latent fingerprints. Based upon his prior experience and his examination of a latent fingerprint discovered upon the Schuth note in comparison with defendant's fingerprints, Officer Mortimer proffered the opinion that the latent fingerprint on the Schuth note was made by the left middle finger of defendant, Salvatore Rosa.

Defendant testified in his own behalf and denied having participated in the robbery of the Archer-Cicero Currency Exchange. He indicated that on July 3, 1970, he was self-employed and that his place of business was his mother's garage located at 6426 South LaCrosse Avenue in Chicago, Illinois. On the morning of the date in question, defendant accompanied one Don Ryan to a currency exchange located at 35th Street and Archer Avenue and subsequently to an auto parts store where defendant purchased the equipment necessary to complete certain repairs on Ryan's automobile. Defendant indicated that they returned to the garage by 10 a.m. where defendant worked on the car in the presence of Ryan and one Roger Tolston for a period of 3-3½ hours. Defendant testified that he

remained in the garage until approximately 4 p.m. at which time he departed with certain members of his family for a dragstrip in Indiana.

Defendant, however, admitted that he had personally executed the hold-up note recovered from Mary Schuth as well as the three additional notes. In this connection, defendant testified that on an unspecified date in May 1970, he had occasion to spend a period of time in the company of an individual known to defendant as Archie Hessler and another person identified only as "Gary." On this occasion the topic of conversation turned to robbery. Defendant's companions, according to defendant, inquired as to how defendant would perfect such an endeavor, suggesting that an armed robbery was a means of obtaining "easy money."

Defendant corrected this misconception, pointing out that "something like that [armed robbery] was violent" and, if caught, "chances are you would get shot down." Defendant concluded, "You would be better off just trying to scare somebody out of the money."

Defendant's companions apparently accepted this analysis and the conversation shifted to the art of drafting suitably threatening notes. Defendant testified that on his own suggestion he drafted several such notes and the group critiqued and edited them so as to concisely convey the bearer's intention. Defendant also testified that he was thoroughly amused by this pastime and that it occasioned considerable laughter and good fellowship.

When questioned on cross-examination as to what had become of the pen used to write the notes, Rosa indicated that it was left on a workbench in the garage in which the notes had been drafted. Defendant agreed, upon examination of the notes at trial, that they had been written by at least two different pens. Defendant also testified that it was not until after he had been arrested that he discovered that the notes had been used in connection with an armed robbery.

Upon his arrest, defendant was confronted with at least one of these notes by investigating officers. Defendant refused to admit or deny that he had written the notes without advice of counsel. Defendant subsequently had occasion to speak to other members of his family, including his brother. Defendant testified that he had told the latter that he did not write the note.

On cross-examination defendant was also shown a photograph of an individual identified as Archie Hester. Defendant indicated that this individual resembled defendant's companion of May 1970, though known to defendant as Archie Hessler.

Defendant also adduced the testimony of his former spouse, Janice Rosa, who testified that on the date in question she had been in defendant's company between 1:30 and 4 p.m. and that thereafter she, defendant and others departed for a dragstrip in Indiana.

Carl Rosa, defendant's brother, testified that on the date in question he arrived at his mother's house at noon, where he observed defendant in the company of Roger Tolston and that defendant remained in the vicinity of the house and garage until approximately 3:30 p.m. at which time the group departed for the dragstrip. This testimony was substantially corroborated by Maureen Rosa, the spouse of Carl Rosa.

Don Ryan testified that on July 3, 1970, he met defendant in the morning and drove him to a currency exchange and an auto parts store. They thereafter returned to Rosa's mother's garage so that defendant could repair Ryan's automobile. Ryan estimated that he was in defendant's company between 9:30 a.m. and 11:45 a.m. on the date in question.

Margaret Rosa, defendant's mother, testified that on July 3, 1970, defendant arrived at her home early in the morning and remained there until 3:30 p.m. when he departed with the others.

On rebuttal, the State called Archie Hester. He testified that he first met defendant in 1971. When shown the photograph previously identified by defendant as depicting the individual known to him as Archie Hessler, the witness testified that the photograph portrayed himself. Hester further testified that during the month of May 1970 he was an inmate of the Illinois State Penitentiary.

Defendant's initial contention, that the trial court erred in precluding defense counsel from introducing into evidence testimony regarding crimes other than that charged in the indictment, merits scant attention. Defendant asserts that between June 1, 1970, and September 25, 1970, four currency exchanges on Chicago's southwest side, including the one which formed the basis of the instant indictment, were victimized by armed robberies; that all four robberies were executed by the same individual; that defendant was viewed by three tellers at police detention facilities in connection with the ongoing investigation of those other occurrences; and, that these three victims failed to identify defendant as the perpetrator of their respective robberies. Defendant concludes that the failure of these witnesses to identify defendant in connection with the other robberies would, of necessity, cast doubt upon Mary Schuth's subsequent identification of defendant as the perpetrator of the particular robbery charged in the instant indictment. Consequently, defendant vigorously argues that the trial court erred in precluding defendant from introducing evidence of these other offenses.

■■ Defendant made no attempt to cogently apprise the trial court of these peculiar facts in the form of an offer of proof. The purpose of an offer of proof is to indicate to the trial court, opposing counsel, and a court of review the nature and substance of the evidence expected to be offered. (*Moren v. Samuel M. Langston Co.* (1968), 96 Ill. App. 2d 133,

237 N.E.2d 759.) If there is no other satisfactory indication of the substance of the evidence a party desires to introduce, an offer of proof should be made. (*Schusler v. Fletcher* (1966), 74 Ill. App. 2d 249, 219 N.E.2d 588.) The degree of specificity which is required in an offer of proof was elucidated in *Hession v. Liberty Asphalt Products, Inc.* (1968), 93 Ill. App. 2d 65, 71, 235 N.E.2d 17, 20-21:

> "to some extent, the requisite formality of an offer of proof will depend upon the circumstances of the particular case. Where it is obvious that the witness is competent to testify to a fact, and it is obvious what his testimony will be if he is permitted to give it, a brief statement by counsel may suffice. (Citation.) In a case such as this, however, where it is by no means clear what the witness will say, or what his basis will be for saying it, the offer of proof must be considerably more detailed and specific * * *. Only in this way can a reviewing court know what was excluded and determine whether the exclusion was proper."

In the instant case, no offer of proof was made on-the-record in accordance with the standard set forth in *Hession.* Although there was some on-the-record discussion, the record is at best confusing with regard to what testimonial evidence could be introduced, the precise nature of such evidence, or its source.

■■■ The admissibility of evidence is determined by analysis of its materiality and relevance to the issues of the particular case at bar. Within the context of the instant case, the burden was on defense counsel to state precisely what the excluded evidence would reveal, not merely allude to what might be revealed or what he personally hoped would transpire. (*People v. Porter* (1975), 29 Ill. App. 3d 456, 330 N.E.2d 599.) Even on appeal, defendant suggests only that the victims of the unrelated robberies did not identify defendant as the man who robbed them. There is no indication that their various opportunities to observe the assailants were substantially the same as that of Mary Schuth or that their apparent failure to identify defendant constitutes clear and convincing evidence that defendant was not involved in the other armed robberies and, by inference, the robbery of the Archer-Cicero Currency Exchange. While such witnesses might be expected to testify that they, in fact, did not identify defendant as the man who robbed them, should they indicate that the gunman matched the general description of, or resembled defendant, the testimony of Mary Schuth would be materially corroborated by collateral matters suggesting defendant's propensity to commit the offense charged in the indictment. Such testimony would most certainly prove devastating to defendant's already tenuous posture. Both the prosecution and the trial court properly acted to protect defendant's right to a fair trial in attempting to exclude from evidence

testimony regarding crimes ostensibly irrelevant to the offense charged in the indictment.

■■ Defendant's belated attempt to remedy this omission by presenting to this court matters *dehors* the record, specifically, a series of hearsay statements contained in various police reports, allegedly supporting his theory may not be considered by this court. Ill. Rev. Stat. 1973, ch. 110A, par. 608(b).

Defendant next contends that the trial court erred in failing to order production of the composite drawing viewed by Mary Schuth so as to determine if she had previously failed to identify defendant as the offender. Defendant contends that if the composite drawing depicted his likeness and if Schuth failed to identify the composite drawing as depicting the perpetrator of the robbery, this revelation would seriously affect the credibility of her in-court identification of defendant as well as the credibility of her previous lineup identification.[1]

■■ The composite drawing was discoverable, if at all, according to the discretion of the trial court pursuant to Supreme Court Rule 412(h) (Ill. Rev. Stat. 1973, ch. 110A, par. 412(h)). Under the circumstances of this case, the trial court should have ordered production of the composite drawing; however, we do not feel that the trial court's failure to order such production prejudiced defendant. Defendant failed to establish the possibility that the composite drawing bore any likeness to defendant. Assuming *arguendo* that it did, Schuth viewed 400-600 photographs in addition to the single composite drawing and her failure to suggest that the latter resembled defendant would have had little effect on her credibility. Considering the fact that the victim did not identify anyone by these means and that her lineup and in-court identification was based upon viewing defendant and upon hearing his voice, the value of the composite drawing to attack her credibility would be negligble. See *People v. Camel* (1974), 59 Ill. 2d 422, 322 N.E.2d 36.

The trial court's failure to order the production of the composite drawing on motion of defendant during the course of trial proceedings was not prejudicial error. See also *People v. Evans* (1976), 42 Ill. App. 3d 902, 356 N.E.2d 874.

Defendant also contends that certain comments by the prosecution in its closing argument were improper and served to deny defendant a fair trial.

In his closing argument to the jury, defense counsel stated, with respect

---

[1] During the course of trial proceedings the prosecution represented to the court that it had effected a diligent search for the composite drawing now in question; that such search had proven unsuccessful; and that the prosecution was unable to produce the drawing for defense examination. These representations were not disputed in the trial court and remain unchallenged on appeal.

to the evidence concerning several armed robberies other than that of which defendant currently stands convicted and, specifically, defendant's possible connection thereto:

> "[I]t is uncontested and uncontraverted and, therefore, you must believe it, that when he failed to be identified, for obvious reasons that he wasn't the man * * *."

In response, the procecution initially noted in its closing argument:

> "These other three armed robberies which the defense has brought up, the defendant is not charged with. He is not charged with committing those other armed robberies. Those other victims could not identify their assailant. But that does not mean that he did not do it. It only means that they could not say positively that he was the man.
>
> And, incidentally, ladies and gentlemen, if there was anything about those other robberies or about the descriptions of those men that committed those robberies that would have been favorable to the defendant, they would have brought it out."

The latter comment met with defense objection, which was sustained and the jury was instructed to disregard the remark.

The prosecution thereafter commented:

> "Ladies and Gentlemen, I say to you, there is nothing that would indicate in any way that he didn't commit those other robberies.
> * * *
> But let it be heard, ladies and gentlemen, he is charged at this time with this robbery and that is what you must decide, not his guilt or innocence of those other robberies."

After the jury was read the instructions which had been discussed in conference, defense counsel interrupted and requested that the jury again be instructed to disregard the aforementioned comments of the prosecution. The court, complying with counsel's request, noted:

> "The court will instruct the Jury that the defendant here is charged with armed robbery, of the occurrence, * * *. Any other robberies are not relevant or material to this case."

The latter comment apparently satisfied defense counsel inasmuch as no further objection was raised.

■■ Examination of the record indicates that the prosecutor's initial comments did not materially prejudice defendant. Prompt defense objection was sustained and the jury was instructed to disregard the comment. See *People v. Parks* (1971), 133 Ill. App. 2d 348, 273 N.E.2d 162.

■■ Subsequent comment by the prosecution, invited as it was by defense counsel and his tactics throughout the course of trial proceedings, similarly provides no basis for reversal. (*People v. Barksdale* (1974), 24 Ill.

App. 3d 489, 321 N.E.2d 489.) In any case, we are convinced that the jury's verdict would not have been affected had the remarks complained of remained unsaid. *People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771.

Defendant finally contends that the trial court's closing remark constitutes an improper verbal instruction to the jury. We note that defendant has failed to preserve the issue for appeal by failing to object to the court's comment when it was uttered. Nor has defendant deigned to include in his abstract all jury instructions tendered so as to insure consideration of the assigned error. See *People v. Mitchell* (1975), 34 Ill. App. 3d 311, 340 N.E.2d 226.

In any case, the court's comments were made only at the urging of defense counsel, after the written instructions had been read to the jury, for the express purpose and within the context of further admonishing the jury to disregard the aforementioned comments of the prosecution in closing argument. The remarks of the trial court provide no basis for complaint.

For the aforementioned reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

DOWNING, P. J., and PERLIN, J., concur.