THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GARY ELLISON *et al.*, Defendants-Appellants.

Fifth District    No. 78-490

Opinion filed October 3, 1980.

John H. Reid and Gary D. Duncan, both of State Appellate Defender's Office, of Mt. Vernon, for appellants.

Nicholas G. Byron, State's Attorney, of Edwardsville (Martin N. Ashley and Nicholas B. Svalina, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE HARRISON delivered the opinion of the court:
Defendants appeal from judgments of the circuit court of Madison

County finding them guilty of deviate sexual assault and unlawful restraint, and finding defendant Gary Ellison also guilty of rape. Defendant Ellison was sentenced to 15 years for rape, 15 years for deviate sexual assault and 3 years for unlawful restraint, with defendant Larry being sentenced to 12 years for deviate sexual assault and 3 years for unlawful restraint, all sentences to run concurrently. On appeal they contend: (1) the trial court erred in denying their motions for a new trial pursuant to section 72 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 72); (2) they were denied a fair trial by the assistant State's Attorney's closing argument; (3) the trial court admitted erroneous rebuttal evidence; (4) the trial court allowed improper impeachment of a defense witness; and (5) the trial court erred in refusing to allow the defense to cross-examine the prosecutrix about prior rape charges she had allegedly brought against others. For the following reasons we reverse and remand this cause for a new trial.

Defendants Gary Ellison and Ike Larry were charged by information alleging that on July 10, 1978, they abducted Ms. Vontella Perry, also known as "Peaches," and committed the aforesaid crimes against her. Ms. Perry testified at trial that at approximately 2 a.m. on the night of July 10, 1978, she was at Big Tony's Tropicana Lounge in East St. Louis, Illinois, where she had brought the night's receipts to her employer from Little Richard's Peacock Alley where she worked. She accepted a ride home from Andre Hudson, who instead took her to his grandmother's house where he attempted to have sex with her against her will. A struggle ensued with Ms. Perry being pushed onto the bed. She identified the two defendants as being let in the house by Andre Hudson. One of them grabbed her arm and said, "Let's go in the bedroom." She testified that she broke loose and ran from the house.

Ms. Perry ran through a field and finally ended up at the Orr-Weathers housing project. Mr. Hudson pursued her in his car and she testified that she refused to leave with him. She stated that she fell on a walkway and was then grabbed by one of the defendants. She clung to a lightpost screaming, but was pulled from the pole and forced into a Continental automobile by defendant Ellison and told to keep her head down.

Ms. Perry further testified that Ellison forced her to engage in deviate sex and sexual intercourse against her will while defendant Larry was driving the car, and that defendants switched places, whereupon defendant Larry also committed a deviate sex act and had intercourse with her. She further stated that defendants told her they had a gun and also threatened to "bust me in the face." The last acts allegedly occurred in a park in Alton. Upon leaving the park, the car was pulled over by the police. Ms.

4

Perry jumped from the car yelling that she had been raped and defendants had a gun. On cross-examination Ms. Perry partially recanted her story and stated that defendant Larry did not have intercourse with her.

East St. Louis police detective John Thurman testified that on the night in question, he was awakened at approximately 3 a.m. by a disturbance at the Orr-Weathers project where he lived. He went outside his apartment where he observed a man violently "whooping" a woman. He stated he first believed this was a domestic quarrel, but testified that after the woman was pulled from the lamp post she hit her head against a metal apartment door with such force that the door was dented. After the woman was hit and dragged around the side of the building, Detective Thurman went inside, got his service revolver, radioed his dispatcher a description of the two people and gave chase. He obtained a partial license number from a car he believed to be occupied by the woman and her assailant, but it proved incorrect. Detective Thurman identified defendant Ellison as the man who was struggling with the woman, although he did not identify Ms. Perry, a past acquaintance of his.

Alton police officers William Fitzgerald and Walter Washington also testified for the State, being the officers who arrested defendants in the park. Officer Fitzgerald testified that after stopping the car, Ms. Perry "bailed out of the vehicle and yelled that she had been raped and that they had a gun." She was naked, yelling and upset. The officer also testified that defendant Ellison was nude in the driver's seat and defendant Larry was in the back seat fully clothed. Officer Washington testified likewise, adding that Ms. Perry had a bruise on her cheek and a cut on her left forearm.

Andre Hudson testified for the defense and stated that Ms. Perry asked him to buy her some drinks at the Tropicana and take her out on a date. Mr. Hudson borrowed his cousin's Continental and as Mr. Hudson and Ms. Perry were leaving the bar, they encountered defendants. Mr. Hudson asked defendant Larry, "Would you lend me some money so I can take this girl with me?" Defendant Larry agreed and then Mr. Hudson stated, "If you all give me some money then you all can go too." Mr. Hudson said Ms. Perry was standing next to him while he asked for the money and said they could go to his grandfather's house. Mr. Hudson testified, "She wanted some money for me to have sex with her," and that it was her idea.

Mr. Hudson testified that after they arrived at his grandfather's home, Ms. Perry refused to have sex with him and in the ensuing struggle she ran from the house as the defendants stood on the front porch. He pursued her to the housing project where she was clinging to a pole and screaming. He stated he released her and chased her again. However, he then saw defendant Ellison and Ms. Perry get into Ellison's Continental.

Hudson stated that Ms. Perry was not struggling or yelling and was not forced into the vehicle.

Defendant Ellison testified in his own behalf. He stated that he had had prior sexual relations with Ms. Perry at the Lakeside Motel in May 1978 in return for $20. He stated that he knew her to be a "working girl," "a regular whore," and "a floozy." He further testified that on the night of July 10, 1978, Mr. Hudson, Ms. Perry, defendant Larry and he had a conversation outside the Tropicana about sexual relations, the price and a place to engage therein. Defendant Ellison stated that after being detained by a friend, he and defendant Larry went to Hudson's grandfather's house. Upon arriving they heard an argument from inside. After ringing the doorbell and knocking on the door, Hudson came to the door with only his pants on and said, "Hey man, this gal is going crazy." Ms. Perry then ran from the house.

Defendants and Hudson left in separate vehicles. Defendant Ellison testified that he witnessed Ms. Perry talking to Hudson in two different locations. Defendant Ellison then saw Ms. Perry in the Orr-Weathers housing project banging loudly on a door. He approached her and asked her to come with him and testified that she responded she had lost her money. Ellison said he told her to forget the money and come with him because she was attracting attention. He stated that without force or threats, she voluntarily got in the car with him and defendant Larry, who was driving.

Defendant Ellison said Ms. Perry wanted to go to a hotel in Centerville but he refused. Since Ms. Perry had lost the money, defendant Ellison testified he told her, "If you want to mess around, you can mess around right here and now." Ellison then said that Ms. Perry disrobed and had intercourse with him. He denied engaging in deviate sex with her. Defendant Ellison further stated that he and defendant Larry changed places but that Larry engaged in no sexual contact with Ms. Perry.

In rebuttal, the State called Ms. Jackie DeWalt to testify. She stated that defendant Ellison's mother, Emma Hudson, asked her to offer Ms. Perry money to drop the charges against her son. This testimony was allegedly offered to refute the contention that Ms. Perry was a prostitute by demonstrating that an individual who would not take a bribe would not prostitute herself.

During closing argument the assistant State's Attorney made the following comments: That the jury could infer a relationship between Andre Hudson and Emma Hudson, defendant Ellison's mother; that defendants were attempting by their activities on July 10, 1978, to turn Ms. Perry to a life of prostitution for their own monetary gain; that defendants failed to cross-examine Ms. Perry regarding the Lakeside Motel incident, when the trial court had precluded such interrogation; and that Ms. Perry was in

grave danger throughout the trial because the defendants intended to kill her. Defense counsel objected 39 times during closing argument, most of which objections were overruled by the trial judge who told them they would have a chance to reply in their argument. Defendants were found guilty and judgment was entered on October 6, 1978.

Defendant Larry filed his post-trial motion on October 30, 1978, and defendant Ellison filed his post-trial motion on October 31, 1978. Both alleged *inter alia* that the prosecutor's closing arguments were inflammatory and that Ms. DeWalt was improperly allowed to testify in rebuttal. Defendant Ellison also complained that the trial court erroneously granted the State's motion *in limine*, thereby denying him the opportunity to cross-examine Ms. Perry regarding alleged prior rape charges she had brought against others. The trial court denied both post-trial motions on November 9, 1978, and entered the sentences as aforesaid. Defendants Larry and Ellison filed their notices of appeal on November 16, 1978 and November 30, 1978, respectively.

Defendants thereafter filed their first motion for a new trial pursuant to section 72 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 72) on April 30, 1979, alleging that Ms. Perry had recanted her trial testimony. In a sworn deposition on March 22, 1979, without a representative of the State's Attorney's office present, Ms. Perry stated that she had voluntary sexual contact with both defendants. She further testified that she had originally told the police she had been raped because she had no clothes on at the time the Alton police stopped the car and she feared arrest. She also stated she had been pressured during trial by the East St. Louis and Alton police, members of the latter transporting her to the trial daily, as well as by the assistant State's Attorney, who, Ms. Perry said, threatened her with a perjury charge shortly before the deposition. Ms. Perry also testified she was under the care of a psychiatrist at the time of the deposition.

Ms. Ernestine Florre also gave a deposition on March 22, 1979. She stated that Ms. Perry lived with her since May 1978. Ms. Florre also testified that Ms. Perry had been depressed since the trial and after a hysterectomy in March 1979, and confessed to her that she had only proceeded with the trial because the defendants were in jail and the charges had already been brought against them.

At the July 12, 1979, hearing on defendants' motion for a new trial, Ms. Florre reiterated the testimony given at her deposition and said that Ms. Perry told her she had not been raped. However, Ms. Perry recanted her deposition testimony. She said she went to the deposition with the defendants' mothers and Ms. Florre and gave the statement under duress. She testified that she was paid $10,000 by defendants' mothers to give the deposition, but could not account for the whereabouts of most of the

money. Ms. Perry further stated that certain people, among them a man known to her only as "Turkey Breast," had threatened her; "I was told that if I didn't drop charges that something was gonna' happen to me." Therefore, she stated in open court that every statement made in the deposition was a lie.

Mr. Ed Sherrill, an employee of the East St. Louis city inspector's office, testified at the motion hearing that he was known as "Turkey Breast" and had known Ms. Perry for approximately three years. He stated that Ms. Perry "used to turn tricks" at Little Richard's. He testified as follows regarding a conversation he had with Ms. Perry:

> "She told me when this first happened, I was down there at Little Richard. And I say, 'I heard about a little incident happenin'.' Said, 'Yeah, "Turkey", I got those [obscenity] in jail. That's where they're supposed to be.' I said, 'What happened?' She said, 'I told them that they raped me.' You know. I said, 'Why did you do that?' She said, 'I don't know why I did it.' You know. I said, 'You shouldn't do things like that.' I said, 'Did they?' She said, 'No.' I said 'Why do you wanta' tell the tale on them people?' She said, 'I don't know.' And that was all she said."

Mr. Sherrill denied ever threatening Ms. Perry.

Following the hearing, having taken the motion under advisement, the trial court denied the motion for a new trial on July 18, 1979. Defendants filed their notices of appeal from this denial on July 30, 1979. Defendants filed a second motion for a new trial pursuant to section 72 on December 14, 1979, based on Ms. Perry's alleged recantation at an October 30, 1979, hearing of the Illinois Prison Review Board. At this hearing for defendants, Ms. Perry stated that she had not been raped and pressed charges only because she was afraid and feared she might go to jail herself.

A hearing on the second motion for a new trial was held on January 4, 1980. Ms. Perry testified that she had no sexual contact with defendant Larry and that she voluntarily engaged in sexual intercourse with defendant Ellison. She again stated that she proceeded with the trial because she was afraid she might go to jail. She also said that the assistant State's Attorney told her what to say at trial.

The motion hearing was continued to February 3, 1980, so the State could obtain the testimony of former assistant State's Attorney Stephanie Robbins. Mrs. Robbins testified that she did not instruct Ms. Perry what to say at trial and also denied having threatened Ms. Perry with prosecution for perjury prior to the March 22, 1979, deposition.

After taking the matter under advisement, the trial court denied defendants' second motion for a new trial on February 6, 1980. Defend-

ants filed their notices of appeal from this denial on March 5, 1980. Therefore, it is from the denial of their separate post-trial motions, as well as their two joint motions for a new trial pursuant to section 72, that defendants now appeal.

Appellants first contend that the trial court erred in denying their motions for a new trial pursuant to section 72 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 72). The basis for the motions was that the victim-prosecutrix Ms. Perry had, at both the March 22, 1979, deposition and the October 30, 1979, hearing before the Illinois Prisoner Review Board, recanted her trial testimony that she had been raped. Relying on *People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, the State initially replies that the issue of consent had already been resolved in the hearing on the first section 72 petition, that appellants were bound thereby, and, therefore, the second such petition was properly denied. However, we note that the grounds for each petition were different instances of recantation, each being accompanied by distinctive circumstances and evidence. Given the different foundation for each petition, we do not view the initial ruling as controlling over the second. Accordingly, we proceed to the merits of this issue.

It is true that Ms. Perry testified as follows during the March 22, 1979, deposition:

"Q. Now, going back to this rape trial. Did Gary and Ike rape you?
A. No.
Q. You know what rape means? It's sexual intercourse by force.
A. (Nods head affirmatively.)
Q. Did you have intercourse with them?
A. Yes.
Q. Was it with your consent?
A. Yes.

* * *

Q. Then, what you're saying today is different than what you said at the trial, do you understand that?
A. Yes.
Q. And why did you say that at trial?
A. Because I was pressured.
Q. By whom?
A. By police and everybody else.
Q. Which police?
A. East St. Louis and Alton.

* * *

Q. Did the State's Attorneys [*sic*] office pressure you?
A. (Nods head affirmatively.)"

As indicated above, this recantation story was confirmed by Ms. Ernestine Florre and Ed Sherrill. Likewise, it is true that Ms. Perry testified as follows at the Illinois Prisoner Review Board hearing on October 30, 1979:

"I will say that Ike Larry and Gary Ellison did not rape me. * * * I am saying that at the time I was scared and I just said that they raped me because I was scared that I might went [sic] to jail."

However, Ms. Perry's testimony at trial was clear that she was raped by the defendants. At the July 12, 1979, hearing on the first section 72 petition, Ms. Perry stated, "I was threatened [to give the deposition]. I was told that if I didn't drop charges that something was gonna' happen to me." She also stated that the then assistant State's Attorney Stephanie Robbins told her that she was going to be charged with perjury. She then reaffirmed her trial testimony that she was raped and denied she had told Ms. Florre otherwise. She also testified that she was paid $10,000 by Ike Larry's and Gary Ellison's mothers to give the deposition, although she denied any such payment during the statement.

At the hearing on the second section 72 petition held on January 4, 1980, Ms. Perry repudiated her trial testimony that she was raped and stated that she had no sexual contact with defendant Larry on the night in question. She said she was told what to say at trial by Mrs. Robbins, then assistant State's Attorney. Ms. Perry testified that she was recanting her trial testimony "[b]ecause I'm tired 'a comin' up here. And I want this incident to come to an end. * * * I'm tired, like I say, I'm tired of comin' up here. It don't make no sense just comin' up here wastin' my gas and everybody else's gas. So I hope this be my last time comin' up here. Like I said, they didn't do it."

Both section 72 petitions were denied and we think properly so. "It is well-settled that recanting testimony is regarded as very unreliable, especially where the recantation includes a question of perjury. (*People v. Marquis* (1931), 344 Ill. 261, 176 N.E. 314; *People v. Bickham* (1974), 23 Ill. App. 3d 1074, 320 N.E.2d 478.)" (*People v. Veal* (1978), 58 Ill. App. 3d 938, 988-89, 374 N.E.2d 963, *cert. denied* (1979), 441 U.S. 908.) Here, Ms. Perry testified twice in open court that she had been raped by appellants. At the deposition no representative of the State's Attorney's office was present. At the Prisoner Review Board hearing, she was accompanied by the mothers of appellants whom she alleged had bribed her. At the second section 72 petition hearing, Ms. Perry indicated fatigue and frustration. The trial court had an opportunity to observe the demeanor of all witnesses at the trial and both post-trial hearings, and any conflicts in such evidence are better left to the trial court rather than the appellate court. (*People v. Nedelcoff* (1980), 87 Ill. App. 3d 849.) Accordingly, we conclude that the trial court properly denied these motions for a new trial.

Appellants also contest numerous statements made by the assistant

State's Attorney during closing argument. These included: The suggestion of a relationship between witness Andre Hudson and appellant Ellison's mother whose last name was also Hudson; an argument that appellants were attempting to convert Ms. Perry to a life of prostitution by which they could financially prosper; an argument that she was in grave danger during trial; and a statement that defense counsel was afraid to cross-examine Ms. Perry on a certain point when, in fact, the trial court *in camera* had precluded such cross-examination. The State contends that these points were waived since they were not included in a post-trial motion and all, save one, were not specifically objected to at trial. Appellants respond that their post-trial motion alleged inflammatory argument by the State and that most of their objections to argument were overruled by the trial court and it would have been fruitless to continue objecting. We have held in the past that "even though no objection was made at trial, a reviewing court may consider assignments of error relating to extremely prejudicial arguments and conduct of counsel 'which deprives the accused of substantial means of enjoying a fair and impartial trial * * *.' [Citations.]" *(People v. Bost* (1980), 80 Ill. App. 3d 933, 945-46, 400 N.E.2d 734.) Finding that these arguments were extremely prejudicial and denied appellants a fair trial, we reach the merits of the prosecutor's conduct.

■■ The suggestion of a relationship between Andre Hudson and Appellant Ellison's mother based solely on their last names was erroneous. There was no evidence introduced by the State that Andre Hudson may be biased in his testimony because a familial relationship existed. If there was bias, the State had the burden to introduce evidence to demonstrate it. To divine such an inference in argument without any evidence to substantiate it was error. *People v. Witted* ·(1979), 79 Ill. App. 3d 156, 166, 398 N.E.2d 68; *People v. Bitakis* (1972), 8 Ill. App. 3d 103, 106, 289 N.E.2d 256.

■■ ■ The type of argument made regarding prostitution was likewise prejudicial error. The State responds that this was a legitimate comment on evidence introduced at trial. The State cites Andre Hudson's request for money from appellants to engage in sexual activity with Ms. Perry and appellant Ellison's belief that Mr. Hudson was her pimp. However, we do not believe a legitimate inference from this testimony is the following:

"Now let's talk about life style. Do you know how you make a prostitute? Do you know how you get a prostitute? Well, you get together with three guys and you take her to an apartment by herself. This is very common. It's not unusual.

You take her up there and you rape her and you beat her and you make her submit to everything you can think of, and when you get done she's about down to zero. Her self-concept is zero at that

point. And then you whisper in her ear, 'You'll do what I say from now on, won't you, or I'll come back and kill you.' And she believes it.

Gary Ellison knew she wasn't a prostitute, but he knew that she was poor. He knew that she could make a good prostitute; she could be a good prostitute; she could be his prostitute. A guy's got to make a living."

The prosecutor stretched her argument beyond the permissible bounds of legitimate inference, the effect of which was "to inflame the passions or develop the prejudices of the jurors without throwing light on the issues." (*People v. Williams* (1962), 26 Ill. 2d 190, 194, 186 N.E.2d 353.) These comments were not based on the evidence and were, therefore, improper. As for the argument that Ms. Perry was in grave danger during trial, defendants objected, the objection was sustained, and the comment was ordered stricken from the record. We believe this particular error was cured.

■■ Finally, the assistant State's Attorney made the following remarks:

"Now Mr. Ellison's further contention is that his position is supported by the fact that he knew Vontella and he had sex with her on some prior occasion. We have only his word for this, because Mr. Godfrey did not bother to ask Vontella that when she was on the stand.

You understand he's suggested that the burden is on us to bring her back. That's not true. How many times does she have to be cross examined? How many times does she have to go through this? She was there. She was on the stand. She took it. She answered his questions. He could have asked her right then, but no, he didn't ask her. He knew what the answer was—'No.' She was never at the Lakeside Motel."

The State contends that these comments were invited by defense counsel's arguments that defendant Ellison admitted having intercourse with Ms. Perry at the Lakeside Motel. This is incorrect. The trial court had ruled that Ms. Perry was protected from any questions regarding her prior sexual activity, but that defendant Ellison could make the strategical decision to bring this occurrence up in his case-in-chief which he did. The prosecutor's remarks were not directed at this testimony, but gave the jury the erroneous impression that defense counsel was afraid to cross-examine Ms. Perry on a matter the trial court had expressly foreclosed. Not only was such a tactic unprofessional, but contemptuous as well. Hence, it was improper and, in light of other errors in argument, reversible error.

We realize that the prosecutor is generally given wide latitude in making the closing argument. (*People v. Eckles* (1980), 83 Ill. App. 3d

292, 300, 404 N.E.2d 358, 365.) However, we believe that the aforesaid improprieties along with numerous others did play a role in the jury's decision of appellants' guilt. We must note that many of these errors have been repeatedly condemned by our appellate courts. We must firmly warn counsel that such malefactions will not become a permanent part of trial practice simply by repeated usage. They work to infect a trial with prejudice and partiality. We can only hope that prosecutors will confess the error of these ways and pursue what appellate courts hold and they well know to be proper trial procedures. The assistant State's Attorney here far exceeded the boundaries of permissible commentary. She was flippant to both defense counsel and the court, and was admonished about "the unprofessional way you have connotated [sic] some of your remarks," whereupon she apologized for "my intemperate language." Yet, she continued her argument full of invective. All members of the State's Attorney's office

> " '* * * would be well advised to remember that every defendant, regardless of the nature of the proof against him, is entitled to a fair trial [citations]. It is one thing for a prosecutor to get caught up in the heat of battle and make a mistake. It is quite another to repeatedly transgress the bounds of decency and fair play. The law expects more and indeed demands more from one who is trained in the law and who represents the People in a criminal prosecution.' [Citation.]" (*People v. Weathers* (1975), 62 Ill. 2d 114, 119-20, · 338 N.E.2d 880.)

Accordingly, we reverse the judgment of the circuit court and remand the cause for a new trial.

■■ Since a retrial is in order, we proceed to a resolution of the remaining issues to prevent the recurrence of any erroneous proceedings. Appellants allege that the State offered improper rebuttal in the form of witness testimony that a bribe attempt of Ms. Perry had failed. This testimony was allegedly offered to show that an individual who would not accept a bribe would not prostitute herself. However, we view this evidence as totally improper. This evidence did not go to rebut the defense of consent; there is no logical connection between the bribe failure and Ms. Perry's consent or lack thereof. (*People v. Karmazinas* (1967), 80 Ill. App. 2d 322, 324, 224 N.E.2d 287.) Moreover, since communicating with a witness is a felony offense (Ill. Rev. Stat. 1979, ch. 38, par. 32—4(b)), this evidence had the effect of imposing in the eyes of the jury vicarious liability on the defendants for the alleged transgressions of others. Such evidence is improper. This evidence was considered by the jury, and we cannot say that the case was so overwhelming against the defendant that it was harmless. Accordingly, they were prejudiced thereby.

■■ Appellants also argue that it was error for the prosecutor to attempt

to impeach Andre Hudson with prior inconsistent statements without proving the existence of these statements. However, as the State notes, appellants waived this point by failing to include it in their post-trial motion. We do not view this matter as plain error, and therefore decline to address it other than to note that the law on proof of prior inconsistent statements is clear and should be followed.

Appellants finally contend that the trial court erroneously refused to permit examination of Ms. Perry regarding charges of rape she had allegedly brought against others and later dropped. They argue that the purpose of this testimony was to show a pattern of false accusation on the part of the prosecutrix and also to demonstrate a motive for the present charges. The State responds that appellants failed to make a proper offer of proof regarding these alleged charges and that this evidence was an improper attempt to attack Ms. Perry's reputation contrary to the provisions of section 115—7 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 115—7).

Following the trial court's ruling on the State's motion *in limine*, the following took place:

"MR. GODFREY: May the Court please, I can understand by this ruling that neither defendant being permitted to inquire of the complaining witness her pattern of conduct of alleging and charging rape of other people other than this defendant, the theory being that this is a woman that claims rape. She has been raped at other times and dropped the charges.

THE COURT: There would be nothing under the law that would allow that evidence to be presented in this trial, Mr. Godfrey, under Section 115—7.

MR. GODFREY: Does the Court understand the defendants' theory is that there was no rape here and she from time to time alleged rape to the police against other individuals, individuals other than these two defendants? For reasons unknown to these defendants, it certainly seems to me that it would be evidence vital to their defense that—to show evidence that she profits in a way for having arrests made for rape and then withdrawing the charge.

MRS. ROBBINS: Your Honor, that is pure nonsense and that is not admissible or relevant. Defense counsel has supplied no evidence of any kind. He's now grabbing at straws having found his first effort at a bogus defense not having been met. He'd have to prove all this up. He would further have to prove that any other claims of rape were unfounded.

* * *

MR. WIMMER: I concur with Mr. Godfrey in that respect. But I'd also like to cite to the Court People v. McClure. It's a 1976 case,

and it says that prior charges of rape are admissible in a trial such as ours. And that citation is 356 NE 2d 899. This case is the exact situation we're in where we—we need as part of our defense to inquire as to prior rape charges, and this case says they are admissible.

＊ ＊ ＊

MR. GODFREY: ＊ ＊ ＊ Our evidence for this rests first with Miss Perry. I don't think Miss Perry is prepared to come in here and deny evidence of rape she claimed against somebody else last year that was brought to court and never prosecuted.

＊ ＊ ＊

MR. GODFREY: Will the record reflect that I made an offer of proof on rape—on the previous rape of 1977. My understanding is that any reference to that under cross examination would be in violation of the motion in limine?

THE COURT: Would be in violation of the Court ruling.

MR. GODFREY: The Court's ruling on that motion?

THE COURT: Yes, sir.

＊ ＊ ＊

THE COURT: All right. The Court will rule that pursuant to Section 115—7 that evidence cannot be admitted and those questions cannot be asked and presented in this case."

■■ We do not view the aforesaid as a proper offer of proof, because there was no documentation to prove that Ms. Perry had filed any previous rape charges, nor were the factual circumstances surrounding the alleged incidents presented. The trial court had no way of knowing whether prior charges had actually been made or what their disposition was, and more than the bare assertion of counsel was needed. (*People v. Robinson* (1977), 56 Ill. App. 3d 832, 371 N.E.2d 1170; *People v. Rosa* (1977), 49 Ill. App. 3d 608, 364 N.E.2d 389.) The trial court, therefore, did not err in its ruling.

For the foregoing reasons, we reverse the judgments of the circuit court of Madison County and remand this cause for a new trial.

Reversed and remanded.

KASSERMAN, J., concurs.

Mr. PRESIDING JUSTICE JONES, specially concurring:

I concur with the majority opinion except as to that portion which holds that it was error to permit the People to present rebuttal testimony of a bribe offer to Ms. Perry.

Defendants presented evidence that Ms. Perry had offered her

services for money and decided to prosecute only upon the failure of defendants to pay. This testimony was a direct attack upon the credibility of Ms. Perry by attempting to show that she was motivated by money. It thereupon became proper for the People to adduce, in rebuttal, evidence that Ms. Perry was offered, and refused, a bribe to withdraw the prosecution. Such testimony would not be admissible to show guilt or innocence of the defendants, but it would be admissible as having a bearing upon the credibility of Ms. Perry as a witness whose motive for testifying was money.

I would rule the rebuttal testimony admissible.