THE STATE OF OHIO, APPELLEE, *v.* BYRD, APPELLANT.

[Cite as State *v.* Byrd (1987), 32 Ohio St. 3d 79.]

(No. 86-512—Decided August 12, 1987.)

*Arthur M. Ney, Jr.,* prosecuting attorney, *Leonard Kirschner, Carl W. Vollman* and *William E. Breyer,* for appellee.

*H. Fred Hoefle* and *Robert R. Hastings, Jr.,* for appellant.

MOYER, C.J. Our first task in a death penalty case is to determine those specific issues raised by the defendant regarding the lower court proceedings. The defendant, John Byrd, has asserted nineteen propositions of law. Many of these have previously been addressed in prior cases and will be disposed of according-ly.

## I

In the first proposition of law, Byrd contends that the use of the same felonies to both elevate the murder to aggravated murder and to elevate the aggravated murder to a capital aggravated murder fails to genuinely narrow the class of murderers eligible for the death penalty. Byrd further contends that the use of an underlying felony as a specification unconstitutionally permits the imposition of death for felony murders upon less proof than in murder cases involving prior calculation and design. Those arguments were previously rejected in *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 177-178, 15 OBR 311, 322-323, 473 N.E. 2d 264, 279-280; *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 136-137, 22 OBR 203, 213-214, 489 N.E. 2d 795, 806-807; and *State* v. *Barnes* (1986), 25 Ohio St. 3d 203, 206-207, 25 OBR 266, 269, 495 N.E. 2d 922, 924-925.

Byrd, in his second proposition of law, argues that the trial court, in its written opinion sentencing defendant to death, impermissibly considered the nature and circumstances of the offense as an aggravating factor rather than as a mitigating factor as required by R.C. 2929.04(B). A similar claim was rejected in *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, at 116-117, 31 OBR 273, at 278, 509 N.E. 2d 383, at 389-390. As this court stated in *Steffen:*

"* * * Obviously, the nature and circumstances of certain offenses will be such that no mitigating feature can be extracted. By its statement on the gruesome and vicious nature of the murder, the trial court herein was merely justifying its conclusion that no mitigating factors can be gleaned from the nature and circumstances of this particular offense." *Id.* at 117, 31 OBR at 273, 509 N.E. 2d at 390.

The trial court in this case also found that there were no mitigating factors in the nature and circumstances of the murder and robbery of Monte Tewksbury. To reach this conclusion, the court was required to review the nature and circumstances of the offense. We do not agree with the defendant's contention that by conducting this required review the court was actually weighing these circumstances against the mitigating factors.

Additionally, defendant contends that the trial court erred in its finding that his young age was not a mitigating factor. The trial court, in its opinion, stated:

"(4) 'The youth of the offender.' The Court finds that the defendant was at the time of his trial [*sic*] 19 years of age, the oldest 19 year old this Judge has ever seen. There is no evidence to suggest that his age was a factor that should be taken into account in mitigation of the sentence of death."

This is a permissible finding for the trial court to make. Although R.C. 2929.04(B) lists youth as a factor to be considered, it does not require anyone under a certain age to be absolved of culpability for his crime. As the trial court observed, there was no evidence presented to suggest that Byrd's age was of any relevance in the crime or sentence of death. Accordingly, the second proposition of law is without merit.

In his third proposition of law, Byrd claims that the argument of the prosecutor during the penalty phase, which urged the jury to impose the death sentence to satisfy public demand and to render justice to the victim and his family, is plain error requiring reversal. Defense counsel failed to object to the argument. In his fourth proposition of law, defendant urges this court to find such failure to

be a violation of the right to effective counsel. The prosecutor's challenged language is as follows:

"The United States Supreme Court stated—and this doesn't go back to 1776, this is within the past few years—'In part, capital punishment, or the death penalty, is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an organized society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs. The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law.

" 'When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they deserve, then there are sown the seeds of anarchy, of self-help, of vigilante justice and of lynch law.'

"And I ask you to impose upon John Byrd the penalty he deserves so that Mrs. Tewksbury and Monte Tewksbury feel that society has given them the justice which they deserve as members of this society. Don't let the memory of Monte Tewksbury feel that he would be compelled to go outside legal processes to be outside the limits of this society to find the justice to which he is entitled to [sic]."

It is important to observe that the first two paragraphs of this argument are quoted from *Gregg* v. *Georgia* (1976), 428 U.S. 153, at 183, which quoted partially from *Furman* v. *Georgia* (1972), 408 U.S. 238, 308 (Stewart, J., concurring). The state contends that, if the prosecutor improperly argued to the jury, then it would be equally improper for the United States Supreme Court to rely on the same rationale as a basis for upholding the death penalty. We disagree. The function performed by a reviewing court and the function performed by a jury are quite different. What may be proper in an appellate opinion is not necessarily appropriate argument to place before a jury. As such, we cannot accept the state's rationale for approving such argument.

The general rule is that some latitude is granted to both parties in closing argument. Nonetheless, a closing argument that goes beyond the record may constitute prejudicial error. See *State* v. *Muskus* (1952), 158 Ohio St. 276, 49 O.O. 122, 109 N.E. 2d 15, paragraph two of the syllabus, certiorari denied (1954), 347 U.S. 938. This is particularly true where such argument implores the jury to return a plea of guilty to satisfy a public demand. *State* v. *Davis* (1978), 60 Ohio App. 2d 355, 14 O.O. 3d 315, 397 N.E. 2d 1215, paragraph two of the syllabus. The closing argument, however, must be reviewed in its entirety to determine if the prosecutor's remarks were prejudicial. *State* v. *Moritz* (1980), 63 Ohio St. 2d 150, 157, 17 O.O. 3d 92, 97, 407 N.E. 2d 1268, 1273, citing *State* v. *Burgun* (1978), 56 Ohio St. 2d 354, 366, 10 O.O. 3d 485, 492, 384 N.E. 2d 255, 263.

A review of the entire closing argument in the instant case reveals that the jury was requested to decide the penalty phase on the evidence presented and not on the grounds of retribution. Although the prosecutor did quote the Supreme Court, the emphasis in his argument was on the strength of the evidence supporting the aggravating circumstances and the tenuousness and lack of evidence in support of mitigating factors. Defense counsel's closing argument also clearly stressed the evidence presented. Most importantly, the judge, in his jury instruction, explained the duty of the jury to consider the statutory factors

and the evidence presented in support of those factors.[1] A review of the entire proceedings establishes that the defendant was not prejudiced by the prosecutor's remarks. We do note, however, that such argument is not proper, and therefore caution prosecutors to avoid such arguments.

The defendant's third and fourth propositions of law are without merit.

Byrd next contends that several jurors were improperly excused at voir dire, thus denying him a right to a fair and impartial jury. This contention is based on the claim that the excused jurors were not unequivocal in their statements as to whether they could consider imposing the death penalty. Such claim is not supported by the record.[2] Accordingly, the exclusion of jurors for cause was proper.

Byrd next challenges the refusal of

---

[1] The court during its instruction to the jury stated that the jury must consider the evidence presented in determining whether the aggravating circumstances outweighed the mitigating factors no less than seven times. The court also stated:

"You are not permitted to change the law, nor to apply your own concepts of what you think the law should be, nor are you to disregard the law in order to avoid an unpleasant decision."

[2] The following testimony reveals that the jurors were properly excused for cause in accordance with R.C. 2945.25(C) and *Witherspoon* v. *Illinois* (1968), 391 U.S. 510, 46 O.O. 2d 368.

1. Prospective juror Marie Klumpe:

"Q. * * * [THE COURT] * * * Before the attorneys ask you any questions, I have one question, and that question basically is, if the evidence warrants it and the law allows it, can you fairly consider the imposition of the sentence of death in a particular case?

"A. [MS. KLUMPE] I have an awful lot of trouble in that, a terrible amount of trouble with that. I don't know whether I can do that or not. I really don't.

"* * *

"Q. [MR. BREYER] * * * Let me ask you flat out, do you believe in the death penalty, ma'am?

"A. [MS. KLUMPE] I guess no, mostly.

"* * *

"Q. [MR. BREYER] What it basically comes down to, the final bottom line, when all the discussions have been stopped, when you are through discussing, it is time to vote and put your name on a piece of paper, could you again sign your name to the piece of paper which said John Byrd, you die in the electric chair? Could you do that?

"A. It's very difficult sometimes to say what you do until you are in the circumstances, but the way I feel now, I don't think I could ever put my name to something that would put somebody else to death."

2. Prospective juror Mary C. Anneken:

"Q. * * * [THE COURT] That question is, if the evidence warrants it and the law allows it, could you fairly consider the imposition of the sentence of death in a particular case?

"A. [MS. ANNEKEN] I don't know, probably not.

"* * *

"Q. [MR. BREYER] * * * can you sign your name on that 12th line knowing, knowing that by signing your name on that 12th line you are putting this man in the electric chair and he will die there? Can you do that?

"A. [MS. ANNEKEN] No."

3. Prospective juror Ellen E. Crocker:

"Q. [THE COURT] Before the attorneys ask you any questions, I will ask you one, that is, if the evidence warrants it and the law allows it, could you fairly consider the imposition of the sentence of death in a particular case?

"A. [MS. CROCKER] I don't believe that I could make that final decision for death.

the trial court to merge the two aggravating specifications for purposes of sentencing. Byrd contends that the aggravated robbery of Monte Tewksbury and the aggravated robbery of the King Kwik store constitute an indivisible course of conduct and may not constitutionally form the basis of two separate aggravating circumstances. Therefore, the two aggravating factors should have been merged for sentencing purposes as required by *State* v. *Jenkins, supra,* at paragraph five of the syllabus.

Byrd further contends that the merger doctrine should be reconsidered. R.C. 2941.25 provides:

"(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

"(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

Byrd relies on subsection (A) for the proposition that aggravated robbery of a store and aggravated robbery of the store's employee are allied offenses of similar import. We disagree. The facts of this case demonstrate that

---

"Q. [MR. MOORE] I want to know whether or not in all circumstances you say no to the death penalty or if there are certain circumstances if you could find the strength to be a participant and carry out what you admit to be the views which you honor. I'm asking you whether or not you can be the carrier, the person to carry forward your views and if the answer is yes, if you can't, the answer is no.

"A. [MS. CROCKER] My principles are such that I don't believe in murder. I think it is wrong, but to make a final decision, I keep going back, I don't think I could do that. I don't have the strength. I just don't have the strength to make up the decision of someone's life. That's my feeling. I'm sorry I can't—."

4. Prospective juror Nancy J. Kaufmann:

"Q. [THE COURT] * * * Before the attorneys question you, I have one question and that question is, if the evidence warrants it and the law allows it, could you fairly consider the imposition of the sentence of death in a particular case?

"A. [MS. KAUFMANN] I don't think so.

"* * *

"Q. [THE COURT] I will take you one step beyond that. Could you, if you find the law and the facts warrant it under any circumstances, sign a verdict which may ultimately result in the death of this defendant in the electric chair?

"A. [MS. KAUFMANN] I don't know.

"* * *

"Q. [THE COURT] I'm not suggesting it is an easy question.

"A. [MS. KAUFMANN] I'd say no."

5. Prospective juror Mary E. Vesper:

"Q. [THE COURT] Before those questions by the attorneys in this case, I have one question, and that question is, if the evidence warrants, and the law allows it, could you fairly consider the imposition of death in a particular case?

"A. [MS. VESPER] No.

"Q. [MR. VOLLMAN] * * * I believe in response to Judge Schott's questions that if you couldn't participate in signing a verdict that would result in the taking of one's life in the electric chair?

"A. [MS. VESPER] No, I couldn't."

R.C. 2941.25(B) is the applicable section. The robbery of the King Kwik was a separate act from the robbery of Monte Tewksbury. Each act required a separate animus. Byrd took cash from the store's cash register. He also took Monte Tewksbury's watch, ring and wallet. These were separate crimes independent of each other. We find no merit to defendant's claim that the two aggravating specifications should have been merged. We thus need not reach Byrd's claim that the merger doctrine announced in *State* v. *Jenkins, supra,* should be reconsidered. The defendant's sixth and seventh propositions of law are not well-taken.

In his eighth proposition of law, Byrd maintains that the trial court failed to give the reasons why the aggravating circumstances outweighed the mitigating factors in its opinion. R.C. 2929.03(F) requires the trial court to state in a separate opinion its specific findings of aggravating circumstances, statutory mitigating factors and any other mitigating factors. "* * * and the reasons why the aggravating circumstances * * * were sufficient to outweigh the mitigating factors." Byrd admits that the trial court listed its findings as to aggravating circumstances and all mitigating factors. His claim goes solely to the adequacy of the trial court's opinion in explaining the reasons the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt.

A reading of the trial court's opinion reveals a detailed review and evaluation of the aggravating circumstances, the nature of the offense, defendant's background and specific findings relating to the existence or nonexistence of all statutory and other mitigating factors advanced by defendant. Furthermore, a review of the opinion reveals why the trial court felt the aggravating circumstances outweighed the mitigating factors.[3] The trial court found that the evidence did not support any mitigating factors. Based on this conclusion, the court found that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. In the absence of any mitigating factors, this is the only logical conclusion. We therefore overrule Byrd's eighth proposition of law.

Byrd contends, in his ninth and tenth propositions of law, that the

---

[3] The trial court, in its opinion, stated:

"* * * The Court further finds that defendant's killing of the victim was completely unnecessary and cold blooded since the victim had submitted peacefully and turned over his personal possessions and money. This killing was completely unnecessary and evidenced the particularly malicious outlook of this defendant.

"* * *

"The proven facts of the aggravating circumstances reveal a pattern of willful, cold-blooded disregard for human life and values well beyond what this judge has seen in other cases.

"* * *

"There is no evidence that the defen-dant's childhood abuse gave rise to a warped personality, causing the defendant to be a 'bully' and display a violent disposition when functioning in society.

"To give credence to this suggested mitigation would be an affront to the sensitivities of the thousands of law-abiding, hard-working citizens of this state who had a similar childhood and have matured to an adulthood of exemplary existence.

"At age eleven the defendant aided another young child who had fallen into a frozen creek. This being the only socially redeeming act of the defendant's life offered or otherwise shown by the evidence it does not rise to the level of a mitigating factor."

death penalty in this case is disproportionately severe compared to penalties imposed in similar cases in the same county. Furthermore, he claims that proportionality review must encompass both cases where the death penalty was sought and cases where it could have been sought but was not. We have previously rejected these claims. *State* v. *Jenkins, supra.* Most recently in *State* v. *Steffen, supra,* we clarified what a court is required to consider in its proportionality review. Paragraph one of the syllabus of *Steffen* states:

"The proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed."

The court of appeals, in its proportionality review of the death penalty in this case, has properly complied with these requirements. Accordingly, there is no merit in Byrd's ninth or tenth proposition of law.

The defendant next urges that the Equal Protection Clause of the Fourteenth Amendment has been violated because within Hamilton County those convicted of capital murder of white people are more frequently sentenced to death than those convicted of capital murder of black people. This issue was not raised at trial and defendant's allegations are therefore not supported by the record. Furthermore, a similar claim was recently rejected by the United States Supreme Court in *McCleskey* v. *Kemp* (1987), 481 U.S. ____, 95 L. Ed. 2d 262. As this court, in *State* v. *Steffen, supra,* at 124-125, 31 OBR at 284-285, 509 N.E. 2d at 395-396, stated, the United States Supreme Court held that, to sustain an equal protection claim, a defendant must show that racial considerations affected the sentencing process in his case. This court approved this test in *Steffen* in rejecting the claim. We reject

Byrd's claim in the instant case for the same reason: Byrd has failed to offer any evidence that improper racial considerations prompted the jury's recommendation of death in this case. The eleventh proposition of law is not well-taken.

Byrd, in his twelfth proposition of law, argues that the trial court's instruction to the jury that it is not to be bound by feelings of sympathy, pity and mercy was plain error, and the failure to object thereto constitutes ineffective assistance of counsel. This argument was previously rejected in *Jenkins, supra,* at paragraph three of the syllabus; *State* v. *Scott* (1986), 26 Ohio St. 3d 92, 108, 26 OBR 79, 93, 497 N.E. 2d 55, 68; *Steffen, supra,* at 125, 31 OBR at 285, 509 N.E. 2d at 396. The instruction was not plain error nor did the failure to object constitute ineffective assistance of counsel.

Byrd claims that the state failed to prove that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Byrd is essentially claiming that there was insufficient evidence presented in support of the aggravating circumstances.

Additionally, Byrd's claim rests in part on his earlier arguments that the two aggravating specifications were duplicative and that his sentence is disproportionately severe. As we discussed earlier, we find no merit in either of these arguments.

A review of the record establishes that there was enough evidence presented from which the jury could find that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Byrd's thirteenth proposition of law is overruled.

In his fourteenth proposition of law, Byrd maintains that the Ohio death penalty statutes are unconstitutional. He raises seven specific challenges to the law, all of which have

been addressed and rejected in previous cases. See *Jenkins, supra; Steffen, supra;* and *Buell, supra.*

Byrd next challenges the trial court's denial of his motion to suppress. Byrd claims that the Forest Park police officer who followed the van and eventually was responsible for Byrd's and the other defendants' arrests was outside his jurisdiction at the time of the warrantless arrest and therefore lacked authority to make a valid arrest.

This claim was not raised in the trial court and we need not consider it here. *State* v. *Williams* (1977), 51 Ohio St. 2d 112, 5 O.O. 3d 98, 364 N.E. 2d 1364; *State* v. *Awan* (1986), 22 Ohio St. 3d 120, 22 OBR 199, 489 N.E. 2d 277. The application of the doctrine of waiver is particularly appropriate here as there is no record on which to determine the merits of Byrd's claim. By not raising the jurisdiction issue in the trial court, defendant failed to introduce any facts into the record to support his claim. It is not clear whether the United Dairy Farmer store where the arrest was made was in Forest Park. Testimony during the hearing on the motion to suppress supports the claim that a police officer from another jurisdiction arrived on the scene before Byrd was taken into custody. Finally, it is not clear from the record exactly who made the arrest.

We note additionally that Officer Mast, the Forest Park officer who Byrd claims was outside his jurisdiction, testified that he asked Woodall, Brewer and Byrd what they were doing *in Forest Park.* Although this testimony is quite tenuous to establish that the officer was within his jurisdiction at the time of the arrest, without any conflicting evidence to contradict the claim, it is sufficient to meet Byrd's bald assertion that the officer was without authority to make the arrest.

Byrd next contends that Officer Mast lacked probable cause to stop and investigate the van and its occupants. Although Byrd admits that Officer Mast did not stop the van, since it stopped voluntarily, he claims that the officer fully intended to stop the van and, thus, the *Terry* v. *Ohio* (1968), 392 U.S. 1, 44 O.O. 2d 383, standards must be applied to the facts of this case. In *Terry, supra,* the United States Supreme Court held that a police officer may, in appropriate circumstances, approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. Nonetheless, the officer must be able to point to specific and articulable facts which, taken together, with rational inferences from those facts, reasonably warrant the intrusion. *Terry* at 21-22, 44 O.O. 2d at 393-394. See, also, *State* v. *Freeman* (1980), 64 Ohio St. 2d 291, 18 O.O. 3d 472, 414 N.E. 2d 1044.

Byrd argues that, in this instance, there were insufficient specific articulable facts to authorize a *Terry* stop. No traffic laws had been violated nor was the officer specifically looking for Byrd or the van. The officer testified that he had a conversation with his supervisor concerning the robbery and stabbing at the King Kwik but admitted that nothing in that conversation linked Byrd or the van to the crime. Therefore, Byrd alleges that the stop and subsequent arrest were unconstitutional and, based on that claim, all evidence seized from the van should have been suppressed.

For the following reasons, we find no merit in this argument. During the hearing on the motion to suppress, Officer Mast explained that, at about 1:00 a.m., he was eating lunch while parked in his marked police cruiser in a K-Mart parking lot. Mast observed a red cargo van traveling westbound on Waycross at a slow rate of speed. The van pulled into the K-Mart and its

headlights were turned off. A few minutes later, the van's headlights came back on and the van left the lot and headed east on Waycross, again very slowly. About four minutes later, the van reappeared, heading west on Waycross. At that point, Mast decided to follow the van. He pulled out and called in the license plate number for a license check. After the van stopped at the United Dairy Farmer store, Mast learned that the van was registered to Harry's Corner.

Mast further testified to the following: (1) the area he was patrolling was a high crime area, the scene of numerous recent break-ins; (2) because of the criminal activity, there were extra officers on duty; (3) most of the businesses were closed in the area; (4) Mast knew from an earlier conversation with his supervisor that there had been a robbery and stabbing at a nearby King Kwik; and (5) Mast, a veteran police officer, believed the occupants of the van were "casing" the area. These facts alone are sufficient to justify a *Terry* stop. *State* v. *Freeman, supra,* at 295, 18 O.O. 3d at 474, 414 N.E. 2d at 1047. However, we need not rely on *Terry* in this case because the officer did not stop the defendants. The defendants voluntarily stopped the van and one of the occupants, Brewer, voluntarily approached the police car. The fact that Mast testified that he intended to stop the van does not affect this fact. A police officer, when approached, cannot be reasonably requested to ignore the approach or not ask questions. Brewer offered a rather unlikely story to explain what he was doing at 1:00 a.m. on a Monday morning in a parking lot of a closed store. Brewer first stated that he had been working on a job. When the officer asked the location of the job, Brewer claimed he had been out drinking and attempting to pick up women. The officer then approached the van and Woodall offered the same conflicting story. Mast obtained identification from Woodall and Byrd, a passenger in the vehicle. The names given by the defendants were run through the computer and it was discovered that there were no current warrants pending. Byrd's and Woodall's check did reveal criminal history. Byrd and Woodall were then asked to exit the van and were patted down. Mast, using a flashlight, looked in the van and saw coins on the floor. There were stocking masks and a knife in a tray on the dashboard. A Shell credit card in the name of Sharon Tewksbury was seen under the passenger's seat. There was also blood on the interior side of the driver's seat. Mast also looked in the back of the van for other individuals and saw a cash drawer from a cash register.

After observing these articles and the blood on the interior of the van, Mast had probable cause to believe a crime had been committed. The initial search of the van by Mast was proper under the plain view exception to the warrant requirement. *State* v. *Williams* (1978), 55 Ohio St. 2d 82, 9 O.O. 3d 81, 377 N.E. 2d 1013. The search of the back of the van was proper to ensure the officer's safety. *Terry, supra.*

The fifteenth proposition of law is not well-taken.

Byrd next challenges the admission of hearsay testimony by Ronald Armstead. Armstead was in the workhouse with Byrd, Brewer and Woodall. He testified to statements made by these defendants while incarcerated.[4] Defendant's argument is

---

[4] The relevant testimony of Ronald Armstead is the following:

"Q. And what questions did they ask you, Mr. Armstead?

based on Armstead's use of the word "they" with regard to what was said to him in conversations Armstead had with all three co-defendants. Byrd claims that statements of the co-defendants were introduced which were not subject to cross-examination by defense counsel.

Evid. R. 801(D)(2)(a) provides:

"Statements which are not hearsay. A statement is not hearsay if:

"* * *

"(2) *Admission by party-opponent.* The statement is offered against a party and is (a) his own statement, in either his individual or representative capacity * * *."

Much of Armstead's testimony falls within Evid. R. 801(D)(2)(a) as nonhearsay. In those portions where Armstead uses "he," such as "He was telling me about how he stabbed that gentleman * * *," it is clear from the context that Armstead is referring to Byrd. Thus, those statements are admissible, as they are clearly Byrd's own statements. It is also apparent from the record that these statements are the most incriminating portion of Armstead's testimony.

The more difficult problem is presented by that part of Armstead's testimony where he used the pronoun "they." The state claims that, while Armstead's language is not a model of English grammar, it is ascertainable from the context that he was testifying about Byrd's statement, not statements of the co-defendants. We disagree. It is not true that Armstead was

---

"A. MR. ROSENWALD: Objection, Judge.

"THE COURT: Overruled. You may answer the question.

"A. They wanted to know about the knife, if they had cleaned the knife would they be able to find blood stains on the knife.

"Q. Who asked you about the knife?

"A. Brewer and Byrd.

"Q. And Byrd asked you about the knife?

"A. Yes.

"Q. What did he ask you?

"A. Well, they wanted to know exactly would they be able to find any blood stains on it and the locations, you know, like where would they send the knife to in order to have it analyzed.

"Q. And did they continue to engage you in conversation?

"A. Yes.

"Q. And what were some of the other questions that they asked you and talked to you about?

"A. Well, they was doing a lot of bragging, you know, about their case, period. Byrd (indicating) and Brewer, I talked to them in Byrd's cell. As a matter of fact, he gave me some stamps that he had got from home for some information he wanted, some information about the law, you know. He was telling me about how he had stabbed that gentleman out there at the King Kwik, you know, and he wanted to be sure that they didn't, wasn't able to find any blood stains on the knife, you know. He wanted to, you know, as much information that he would get from my standpoint, how could they be able to find any blood on the knife if they cleaned it.

"Q. Now, did you see these defendants after they went to Preliminary Hearing?

"A. Yes, I did.

"Q. Did Byrd talk to you or was he bragging then about what happened over there?

"A. When they brought 'em in there's a hallway leading into A block. You could hear them from the hallway all until when he got inside the compound where we was, they was bragging.

"MR. ROSENWALD: Judge, I have to object to they.

"THE COURT: Can you be more specific?

90

only repeating Byrd's statements. In fact, it is clear in at least one point that Armstead was repeating co-defendants' statements:

"Q. THE COURT: Can you be more specific?

"A. ARMSTEAD: Byrd, Brewer and Woodall, they was bragging. They felt they had went to Preliminary Hearing, they had felt that * * *."

The problem was exacerbated by the prosecutor's framing of his questions. At more than one point, the prosecutor asked questions that contained the objectionable "they." For example, "And what questions did they ask you, Mr. Armstead?"; "And did they start

asking you some questions, some technical questions that you may know about the law?"; "And what were some of the other questions that they asked you and talked to you about?" These questions, no doubt, encouraged Armstead to respond with the same pronoun.

Such questions and the responses were objectionable as inadmissible hearsay. Evid. R. 801(C). A close review of those hearsay statements, however, reveals that they were not so prejudicial as to require reversal of Byrd's conviction. Two of the responses and, in fact, the two most damaging, were clearly attributed to

---

"A. Byrd, Brewer and Woodall, they was bragging. They felt they had went to Preliminary Hearing, they had felt that—

"MR. ROSENWALD: Object to they.

"A. They didn't have any case, Brewer, Byrd, and Woodall, they felt that the State didn't have no case because at Preliminary Hearing some young guy that took the stand supposedly had went to school with him (indicating), he testified that there was a black guy and a white guy that left the King Kwik store at the time of the murder. So they felt that you all didn't have no case on them.
"* * *

"Q. As a result of hearing that television thing, what did you do at a later time?

"A. Okay. We was waiting for PM Magazine to come on because they was going to give a profile of the guy, the gentleman that was killed at the King Kwik, his daughter, she's supposed to be launching a singing career, so, you know, we was going to watch the program.
"* * *

"(Whereupon, a video cassette was played to the Jury without audio.)

"Q. Mr. Armstead, you heard the audio portion of that out there at the Workhouse and you saw just what we did here this morning. Was Byrd with you when you saw that?

"A. Yes.

"Q. Would you tell this Jury what he said when that man's picture came on the screen?

"A. He said, 'Fuck him,' you know. 'He deserved to die,' and he said, him, Byrd, Brewer, all of them said, 'Plus the fact the Bitch can't sing.'

"Q. Let me ask you this question. Did Defendant Byrd specifically tell you that he's the one that stabbed Monte Tewksbury?

"A. Yes, he did.

"Q. How did he say that?

"A. Okay. See, he kept on worrying, he, you know, he kept on worrying about that knife, so like he had got some stamps and I needed some stamps, so I was in the cell talking with him first and then Brewer came in and then we just started, they just started asking me questions, and he said, 'Yeah, I killed him, I killed him, you know, because he was in my motherfucking way, fuck him,' you know. That's the whole attitude they took the whole time they were there, they don't care, you know. He don't care (indicating).

"Q. Did Brewer tell you who took the money?

"A. Brewer took the money. He stabbed him (indicating)."

Byrd in Armstead's later testimony. These involved the questioning on cleaning the blood from the knife and the responses of the three to viewing the PM Magazine report on the Tewksbury family. The response that included "* * * all of them said, 'Plus the fact the Bitch can't sing' " does not go to the truth of the matter asserted and is thus not hearsay. The statements that the defendants claimed the state had no case against them following a preliminary hearing also does not go to the truth of the matter asserted. Finally, the last question by the prosecutor on direct examination, "Did Brewer tell you who took the money?" was not objected to by defense counsel and is therefore waived. We conclude that, in light of the other proper testimony and overwhelming evidence, the admission of Armstead's response was harmless error.

In addition, Byrd submits that he was denied his right to confront Armstead in an effective manner when the trial court limited the scope of cross-examination as it pertained to Armstead's prior criminal record. Byrd does not specify exactly what he was prevented from exploring.

Evid. R. 609 authorizes the admission of evidence of convictions within ten years prior to the date such evidence is sought to be introduced if punishable by imprisonment in excess of one year. Evid. R. 609(B) permits evidence of convictions more than ten years preceding, but only under special circumstances set out in the rule. In this case, Armstead admitted a 1972 "escape charge" which was beyond the ten-year period. Further, although defense counsel was at one point restricted from pursuing what the prior conviction within the ten years concerned, he successfully obtained the answer (a reference to robbery) at a later point.

We find no basis in the record from which to conclude that counsel's opportunity to cross-examine Armstead was impermissibly limited. Defense counsel was accorded sufficient latitude to impeach Armstead's credibility. For the foregoing reasons, Byrd's sixteenth proposition of law is overruled.

Byrd, in his seventeenth and eighteenth propositions of law, argues that the evidence was insufficient to support the verdict and that the verdict was against the manifest weight of the evidence. Byrd claims that there was a failure of proof as to defendant's identity as the one who robbed the King Kwik and robbed and killed Monte Tewksbury. To support this claim, Byrd cites the following factors: (1) his fingerprints were not discovered on any of the recovered items, (2) the shoe prints found at the King Kwik did not match Byrd's shoes, (3) no one from the King Kwik identified Byrd, (4) following his arrest, Byrd had less that $5 on his person, and (5) no blood was found on Byrd's shirt or shoes.

Byrd's claim ignores the evidence that was presented at trial, including: (1) Byrd's admissions to Armstead, (2) testimony placing the defendant in the red van and the murder weapon in his hand, (3) testimony placing the van at the scene, (4) items recovered from the van and where they were in relation to Byrd, and (5) blood on Byrd's pants. A review of the record establishes that the state produced some credible evidence on each element of the crimes charged and, thus, there was sufficient evidence presented for the case to be submitted to the jury. Furthermore, there was substantial evidence supporting a reasonable conclusion that all elements of the offense were proven beyond a reasonable doubt. Defendant's seventeenth and eighteenth propositions of law are without merit.

In his final proposition of law, Byrd maintains that the trial court er-

red in admitting testimony concerning the robbery of the U-Totem store. Although Byrd was indicted for the aggravated robbery of the U-Totem store, this count was severed from the remaining counts for purposes of trial. The court did, however, allow evidence of the U-Totem robbery to be admitted at trial. Byrd maintains that this evidence of another crime for which he was not on trial was inadmissible and, further, that the prejudicial value of this evidence substantially outweighed the probative value.

Byrd is correct in his contention that the rule is that evidence which tends to show that the accused has committed another crime wholly independent of the offense for which he is on trial is generally inadmissible. *State v. Curry* (1975), 43 Ohio St. 2d 66, 72 O.O. 2d 37, 330 N.E. 2d 720; *State v. Wilkinson* (1980), 64 Ohio St. 2d 308, 18 O.O. 3d 482, 415 N.E. 2d 261. Nonetheless, this evidence was properly admitted pursuant to R.C. 2945.59 and Evid. R. 404(B). Evid. R. 404(B) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, *identity,* or absence of mistake or accident." (Emphasis added.)

Identity of Byrd as both a participant and as the principal offender was a contested issue at trial. The U-Totem evidence which supported the state's allegation that Byrd was the participant with the knife was highly probative on this issue. This U-Totem robbery was also very similar to the King Kwik robbery and those similarities coupled with the discovery of the U-Totem cash register drawer in the van helped establish identity of the

defendant as a participant in the King Kwik robbery. Testimony of Dennis Nitz identifying the man who pushed him as having red hair, and the man who chased Henneberry as holding the knife, which Nitz also identified, was highly probative on the issue of identity of Byrd as the principal offender. A similar situation was presented in *State v. Moorehead* (1970), 24 Ohio St. 2d 166, 53 O.O. 2d 379, 265 N.E. 2d 551, where this court held that the other acts testimony was admissible.

Byrd's nineteenth proposition of law is without merit.

## II

We now undertake the independent weighing process required by R.C. 2929.05(A) to determine whether the aggravating circumstances of which the defendant was found guilty outweigh the mitigating factors beyond a reasonable doubt. The aggravating circumstances of which Byrd was found guilty were that he:

"[1] * * * as the principal offender committed the offense of the Aggravated Murder of Monte B. Tewksbury while the defendant was committing or attempting to commit the offense of the Aggravated Robbery of the King Kwik store located at 9870 Pippin Road.

"[2] * * * as the principal offender committed the offense of the Aggravated Murder of Monte B. Tewksbury while the defendant was committing or attempting to commit the offense of the Aggravated Robbery of Monte B. Tewksbury."

Byrd presented one witness during the penalty phase of this proceeding and one newspaper story. Byrd also addressed the jury in an unsworn statement.

The defense witness was Mary Lou Ray, the mother of the defendant. She testified that the defendant's father went to jail shortly after their son was

born and that she had not seen him for eighteen years. She remarried two times and explained that both husbands abused her son, and beat her in his presence.

The newspaper clipping referred to an incident that occurred while Byrd was attending elementary school. Mrs. Ray explained that her son and a neighbor had been responsible for saving a young child who had fallen into a frozen creek.

Mrs. Ray also testified that the defendant had a learning disability which required him to receive special treatment throughout his school years. According to Mrs. Ray, her son was extremely frustrated by the ridiculing he received from other children.

On cross-examination, Mrs. Ray admitted that she had filed charges against her son in juvenile court. She also admitted that she had not reported any abuse of Byrd to authorities.

In Byrd's own statement, he expressed remorse for what happened. He also stated that he was drunk and using drugs at the time of the incident. He pointed out that he was only nineteen years old and he could rehabilitate himself if given a chance to live. Byrd

also stated the specific charges composing his juvenile record and the convictions he had as an adult, explaining that he felt that the jury should know his record. The state presented no witnesses in the mitigation hearing.

Of the factors contained in R.C. 2929.04(B),[5] we find that factors (1), (2), (3), (5) and (6) do not apply. Factor (4), the youth of the offender, has been previously discussed and we note the fact that at the time of the offense the defendant was nineteen years old. We reiterate, however, that youth, by itself, does not absolve the defendant of responsibility for this crime. Although the youth of this defendant is considered as a mitigating factor, in the absence of any evidence introduced to show why this factor should be given great weight, we grant it very little weight.

With regard to factor (7), we have considered defendant's childhood, his learning disability, his lifesaving experience when he was in grade school, Byrd's claim that he had been drinking and using drugs at the time of the crime and the fact that there was no evidence to support this claim. In considering the nature and circumstances

---

[5] R.C. 2929.04(B) provides:

"* * * [T]he court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

"(1) Whether the victim of the offense induced or facilitated it;

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of committing the offense, the offender, because of a men-

tal disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

of the offense, we find nothing mitigating about the stabbing of a completely compliant victim. From this consideration, we find that the aggravating circumstances outweigh these mitigating factors beyond a reasonable doubt.

Based upon this independent review, we uphold the sentence of death.

### III

We now turn to our final responsibility in this case, which is the review of the proportionality of this death sentence. As recently clarified in *Steffen, supra,* at paragraph one of the syllabus, this review encompasses only those cases we have previously reviewed in which the death penalty has been imposed.

In considering those cases, we find that, compared with the death penalty cases decided by this court, the sentence here is not excessive or disproportionate. The death sentence has previously been upheld in similar cases of aggravated robbery and murder. *Jenkins, supra; Barnes, supra; State* v. *Williams* (1986), 23 Ohio St. 3d 16, 23 OBR 13, 490 N.E. 2d 906; *State* v. *Mapes* (1985), 19 Ohio St. 3d 108, 19 OBR 318, 484 N.E. 2d 140; and *State* v. *Martin* (1985), 19 Ohio St. 3d 122, 19 OBR 330, 483 N.E. 2d 1157. The cases are similar to the instant case in that a victim was murdered during the course of an aggravated robbery. Although this case does not involve torture or a sexual assault, it does involve a completely compliant victim who gave Byrd no reason to stab him. We find that the death penalty is not inappropriate considering the senseless nature of the murder and the similarity to other cases in which the death penalty was upheld.

In conclusion, we affirm the appellant's convictions and sentence of death. We find that Byrd was accorded a fair trial and a complete review by the court of appeals.

The judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

SWEENEY, LOCHER, HOLMES, DOUGLAS and WRIGHT, JJ., concur.

H. BROWN, J., concurs separately.

HERBERT R. BROWN, J., concurring. I believe that the majority gives insufficient stress to the fact that the defendant being sentenced to death in this case was only nineteen years old at the time of the murder. Ordinarily such a youthful age would be accorded great weight in mitigation. Execution of a teenager ought not be allowed without painstaking attention to the age factor. However, the evidence in this record demonstrates that Byrd's chronological age of nineteen does not accurately reflect his maturity.