CHRISWELL *v*. STATE.

· Opinion delivered May 31, 1926.

1. HOMICIDE—INSANITY—INSTRUCTION.—An instruction, in a prosecution for murder, to acquit if the jury believed from evidence beyond a reasonable doubt that defendant was so mentally deficient that he could not discern right from wrong and could not control his actions because of his mentally deficient condition, *held* erroneous.

2. CRIMINAL LAW—SUFFICIENCY OF GENERAL OBJECTION.—Where an instruction on insanity in a prosecution for murder is inherently defective, a general objection is sufficient to draw the attention of the court to its defects.

3. CRIMINAL LAW—PROOF OF INSANITY.—Proof that an adult defendant had the intelligence of a child from 7 to 9 years old is insufficient to show that he was insane and therefore incapable of committing a crime.

4. HOMICIDE—CONVICTION OF MURDER—EVIDENCE.—Evidence *held* sufficient to sustain a conviction of murder in the second degree.

5. CRIMINAL LAW—HARMLESS ERROR.—Giving an erroneous instruction on insanity was harmless error in a prosecution for murder where there was no competent evidence tending to establish that defense.

. . Appeal from Scott Circuit Court; *John E. Tatum,* Judge; affirmed.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee. ,

WOOD, J. William Chriswell was indicted by the grand jury of Scott County, charged with the crime of murder in the second degree in the killing of one Virgil Isom. The indictment was in proper form. The testimony for the State tended to prove that Chriswell was jealous of Isom because the latter went with a young lady by the name of Zelma Shelton, to whom Chriswell

was engaged to be married. There was testimony to the effect that Chriswell had requested Zelma Shelton to permit him to accompany her to a dance at Harley Harper's on Monday night, the night of the killing. Zelma refused, and he said to her at the time that if she did not go with him she would not go with any one else. She did attend the dance that night with Virgil Isom. Chriswell attended the dance, and one of the witnesses stated that Chriswell asked if Virgil Isom was much of a scrapper, and said that if things didn't go right after the dance he (Chriswell) would find out. A witness, at whose house the dance took place, testified that he heard Chriswell say that night that he would whip Virgil Isom after the dance, or get whipped. After the dance Virgil Isom and his companion took the two Shelton girls back home, and, as the young gentlemen were returning, they passed a stack of lumber on the road, near which Chriswell was standing. As Virgil Isom passed by, Chriswell knocked him down with a club, hitting three or four licks after he fell, then jumped on him and began hitting him with his fist. Chriswell desisted when Buck Shelton told him to quit. Chriswell then left. Isom was carried to a neighbor's house, where he died within a few hours, without regaining consciousness, as the result of the blows he had received at the hands of Chriswell. The testimony on behalf of the State tended to prove that the motive of Chriswell for striking Isom was jealousy. One of the witnesses for the State, the officer who arrested Chriswell, testified that he informed Chriswell that Isom was dead—that he (Chriswell) had killed him—and Chriswell stated that he guessed he was in for it; that he hit Isom with a club because he was mad at him for taking his girl to the dance; that he didn't intend to kill him—only to knock him down and whip him; that he hit him three or four times with his fist after Isom fell. He further asked witness if witness thought he could get it reduced to manslaughter, and stated that if he could it would not be so bad. These statements of Chriswell were free and voluntary.

Miss Zelma Shelton testified, on behalf of the defend-
ant, that she was engaged to Chriswell. She attended
the dance, and went with Virgil Isom. She had also been
walking with Isom the afternoon of that day, and had
told Chriswell about it. She saw Chriswell at the dance,
but didn't talk with him. After the dance she also saw
him and her brother coming on behind her and Isom.
She stated that, after the boys had returned to her home
with witness and her sister, she heard Virgil say, when
he went to leave, that he was going back where Chriswell
was at the lumber stack. She denied that she and Chris-
well had had any words in regard to Isom on the Sunday
afternoon before the Monday night of the killing.

Chriswell himself testified, and denied that he and
Zelma Shelton had any disagreement about Isom, and
denied that he had any conversation on the night of the
killing to the effect that he was going to assault Isom. He
stated that he and Buck Shelton, Zelma's brother, stopped
at a lumber pile, waiting for Virgil to leave the Shelton
house so that he could go down and get a suitcase he had
left there. When Isom left the Shelton house and came
back, he passed near the lumber stack where witness was
standing, and as he passed he hit witness on the
shoulder with his left hand, at the same time having his
right hand in his pocket. Witness first hit Isom two or
three licks with his fist, and stumbled and fell on a stick,
which he picked up, and with this stick he hit Isom three
or four times. He had no intention of killing Isom.
He had no ill-will or malice toward Isom. He left Isom
lying on the ground and went to Shelton's and got his
suitcase and left. Witness stated that he went to school
about eight years, and was in the third grade when he
stopped; that when he was ten or twelve years old he was
kicked in the forehead by a horse, leaving a scar.

Chriswell's mother, brother and sister testified to
the effect that Chriswell was kicked in the forehead by a
horse when he was ten or eleven years old, leaving a
long deep scar; that he remained in bed from the injury
for a considerable time, and after he recovered he

attended school five or six years, but never advanced from the fourth grade. Chriswell's mother testified that his actions were sometimes peculiar; that they endeavored to assist him in his studies, but without results. After the horse kicked him, at times he showed an almost complete lack of intelligence both in actions and looks. He was morose, irritable and ill-tempered, and never exhibited intelligence greater than that possessed by a child eight or nine years of age. Up until he was eighteen or nineteen years old his mother watched over him and cared for him just as if he were a child. About that time he became unruly and refused to obey her, and frequently left and was gone for weeks at a time, when she didn't know where he was. His mental condition was embarrassing to her and the family, and he did many things witness didn't think a sane person would do. He told witness, when he came home on Monday night of the killing, that he had a fight with Isom, but he didn't appear to believe that the result of the fight was anything at all serious. He stated to witness that he might have to pay a fine, and wanted to get work at the mill so that he could earn money enough to pay the same. Witness further testified that, at times, her son would forget the names of his brothers and sisters, and would ask witness what their names were. From her observation of his conduct since the injury caused by the kick on his forehead she was of the opinion that her son was insane. On cross-examination she testified that her son had been in the penitentiary, where he was sent for three or four years on the charge of carnal abuse, and after serving two years he was paroled. The testimony of Chriswell's sister and brother was substantially the same as that of his mother.

The instructions of the court on murder in the second degree and manslaughter, the offenses included in the indictment, and likewise the instructions on self-defense, reasonable doubt, presumption of innocence and credibility of witnesses, were all free from error, and conformed to the law on these familiar subjects, as it has been often

announced by this court. Hence we find it unnecessary to set them out and comment upon them. Among the instructions given by the court was the following:

"No. 21. The court instructs the jury as a matter of law that an insane person is not amenable to the law for their acts. So in this case, if you believe from the evidence beyond a reasonable doubt that the defendant was so mentally deficient that he could not discern right from wrong and could not control his actions because of his mentally deficient condition, if he was deficient, then you should acquit the defendant."

The defendant objected and duly excepted to the giving of this instruction.

This instruction was contrary to the law on the subject of insanity as announced in numerous decisions of this court. *Woodall* v. *State,* 149 Ark. 33; *Kelly* v. *State,* 146 Ark. 509; *Hankins* v. *State,* 133 Ark. 38; *Bell* v. *State,* 120 Ark. 530, and cases there cited. The instruction was inherently defective, and a general objection would be sufficient to draw the attention of the court to the defects therein. But, after a careful examination of the testimony, we have reached the conclusion that the instruction, although erroneous, was not prejudicial, for the reason that there was no testimony to warrant the court in submitting the issue of insanity to the jury. The testimony of the witnesses on this issue tended to prove that the appellant, after he arrived at the years of maturity, possessed only the intelligence of a child from seven to nine years of age. But an adult with the intelligence of a child from seven to nine years of age would be mentally capable of committing a crime, unless it were shown by a preponderance of the evidence that such person was insane, under the tests laid down by the court in the above cases. In other words, where an adult person has the intelligence of a child from seven to nine years of age, that fact alone cannot be made the test as to whether he is insane, and therefore not capable of committing a crime under the rules and tests announced by the court in the above cases.

The testimony adduced by the appellant, given its strongest probative force in his favor, does not tend to prove that, at the time of the commission of the crime charged, the appellant was insane. The appellant's own testimony, if believed by the jury, would have justified them in acquitting the appellant, or at least in finding that he was guilty of no higher offense than that of manslaughter. There was nothing in his testimony to indicate that his conduct in slaying Isom was the result of a diseased mind, nor was there anything in the testimony of appellant's mother, brother and sister, tending to prove that, at the time of the killing, the appellant was insane. The facts stated by them did not warrant their opinion that the appellant was crazy, in the sense that he was not responsible under the law for the crime charged.

We conclude therefore that the giving of the instruction No. 21, although erroneous, could not have been prejudicial to the appellant, but, on the contrary, the submission of the issue of insanity to the jury, under the undisputed testimony, allowed the jury to consider a defense to which appellant was not entitled, and hence was in appellant's favor rather than prejudicial to him. The judgment is therefore correct, and it is affirmed.