SHEPPARD *v.* STATE.

5133                                  394 S. W. 2d 624

Opinion delivered October 11, 1965.

[Rehearing denied November 8, 1965.]

786

*George Howard, Jr.,* for appellant.

*Bruce Bennett,* Atty. General, By: *William Powell Thompson,* Asst. Atty. General., for appellee.

GEORGE ROSE SMITH, J. The appellant, John Henry Sheppard, aged 19, was charged with having murdered Annie Yocum Willett, aged 69, in the perpetration of rape. This appeal is from a verdict and judgment finding the accused guilty of murder in the first degree and sentencing him to death.

There is not, and hardly could be, any contention that the verdict is not supported by sufficient evidence. We briefly summarize the proof. Mrs. Willett and her husband lived on a farm about ten miles west of El Dorado. On the morning of July 1, 1964, Willett started for his place of work in the oil fields at about eight o'clock, leaving his wife at home alone. About an hour later the couple's grown son, Buford Willett, came by to see his mother, but she was not there. Buford became concerned about her absence, especially as he found that the kitchen stove had been pulled away from the wall and as he also remembered having thought that he had glimpsed a prowler in the barn on the preceding evening.

For several hours a search was conducted, at first by Buford alone, then by him and his father, and finally by police officers and volunteers. Frank Willett eventually discovered his wife's nearly nude body in a creek about half a mile from the Willett home. The body was marked by many scratches, bruises, and other evidences of violence. An autopsy revealed that Mrs. Willett had been raped and that her death had been caused by drowning.

There were indications that the assault occurred in a wooded area between the house and the creek. There the searchers found torn clothing that had been worn by Mrs. Willett, her broken glasses, and a pair of yellow plastic gloves positively identified by Buford Willett as belonging to the appellant Sheppard, who had worked for Buford as a tractor driver and farm hand. The officers made a cast of a footprint found in the mud by Mrs. Willett's body.

In the latter part of the morning Sheppard appeared at another farm some three miles from the Willett place. It was not his regular place of employment, but he spent the day there. There is testimony that he said that he had killed someone and that it made him feel funny. Sheppard was arrested that afternoon as he was going to his parents' home. About 30 minutes after his arrest, which was also about 15 minutes after he was taken to jail, he was interviewed by Officer Taylor. Sheppard freely admitted his guilt, giving an account that dovetailed with the physical evidence already discovered. Sheppard said that he had hidden in the Willett barn overnight and had entered the house after Frank Willett left for work. Sheppard surprised Mrs. Willett in the kitchen, dazed her with a blow, and dragged her to the wooded area. At first he denied the assault, but he admitted this part of the crime when he was informed that Mrs. Willett's body showed that she had been raped. Sheppard said that he had drowned Mrs. Willett by holding her head under the water.

There were recent scratches on Sheppard's arms and blood on his clothing. When one of his boots was compared with the cast made by the officers two identifying marks afforded positive proof that the footprint had been made by the boot that Sheppard was wearing when he was arrested. Without narrating the proof in further detail we think it sufficient to say that the evidence shows beyond any doubt that Sheppard committed the brutal crime for which he was tried.

I. The court was correct in overruling a motion for a change of venue. The two lawyers appointed to defend Sheppard testified that in discussing the case with people in the county they encountered a widespread belief in the accused's guilt, owing to newspaper, radio, and television reports. This fact, however, does not prove that Sheppard could not obtain a fair trial in the county. To the contrary, one of the attorneys stated that he had not heard anyone say that a fair trial could not be had, and the other testified that he had heard only a few people make that statement. There was other affirmative proof that the accused could receive a fair

trial in the county. Our study of the record convinces us that Sheppard was in fact tried fairly. We certainly cannot say that the circuit judge abused his discretion in refusing to grant a change of venue. *Leggett* v. *State,* 227 Ark. 393, 299 S. W. 2d 59 (1957). The case is unlike *Hildreth* v. *State,* 214 Ark. 710, 217 S. W. 2d 622 (1949), cited by the appellant, for here it is not shown, as it was in that case, either that many residents of the county thought that the accused could not obtain a fair trial or that the fear of public enmity prevented those citizens from making affidavits to support the request for a change of venue.

II. Before the trial the accused, a Negro, moved to quash the jury panel on the ground that there had been a systematic exclusion of Negroes from juries in Union county. In the first instance defense counsel offered no proof to support the motion. After the trial, however, Sheppard's present attorney adduced some evidence upon the point. Of course this testimony should have been offered in the first place, for otherwise the accused is in the position of having speculated upon the chance of a favorable verdict before making his attack upon the composition of the jury. In any event, however, we find no merit in this assignment of error.

There is almost no proof of discrimination in the selection of jurors in recent years. The case was tried at the September, 1964, term. During the preceding five years "quite a few" Negroes regularly sat on the jury. At least twelve were among the veniremen called for the September term. This number represents a ratio not demonstrably disproportionate to the ratio of qualified Negro electors in the county, though there is no indication that such a result was deliberately sought by the jury commissioners. Quite the opposite, the testimony indicates that the jurors were chosen without regard to color.

Perhaps the strongest circumstance tending to confirm the trial court's fairness and impartiality is the fact that one of the three jury commissioners appointed by the trial judge was a Negro—a man with fifteen years

experience as a school teacher and principal. Such an appointment goes far toward meeting the criticism frequently made, that the commissioners are not sufficiently acquainted with the Negro electors.

The single point in counsel's argument that finds support in the proof is the fact that the electors were designated by race in the list of qualified voters. Our attention is directed to *Avery* v. *Georgia*, 345 U. S. 559, 97 L. Ed. 1244, 73 S. Ct. 891 (1953), but the court did not hold that such a practice is in itself sufficient to establish discrimination in the selection of the jury. (It may be noted in passing that under our new system of voter registration the elector's race is not shown. *Faubus* v. *Fields*, 239 Ark. 241, 388 S. W. 2d 558 [1965].) We conclude that the court was right in refusing to grant a new trial upon the ground now urged.

III. It is insisted that the admissions made by Sheppard when he was first taken to jail were inadmissible. In conformity with the rule announced in *Jackson* v. *Denno*, 378 U. S. 368, 12 L. Ed. 2d 908, 84 S. Ct. 1774 (1964), the trial judge first heard the testimony in chambers and ruled that the confessions were voluntary. This ruling is supported by proof that is substantially undisputed. There is uncontradicted testimony that Officer Taylor warned Sheppard that he did not have to make a statement and that any statement he might make would be used against him. This officer also asked Sheppard if he wanted an attorney; the answer was "No." There is not even a hint in the record that Sheppard was mistreated or abused in any way. Indeed, the proof is so one-sided that counsel did not ask that the issue of voluntariness be submitted to the jury. The court was not required to submit the issue on its own motion. *Burton* v. *State*, 204 Ark. 548, 163 S. W. 2d 160 (1942).

In this court it is argued that Sheppard is of such low mentality that he was incapable of making an admissible confession or of intelligently refusing to request the aid of counsel. At the trial the court was not asked either to rule upon these points or to submit them to the jury. Our study of the record convinces us that neither point must be sustained as a matter of law.

Sheppard was confined to the State Hospital from August, 1960, until October, 1962. He was found to have a mild, idiopathic, mental deficiency, but he was without psychosis. His Intelligence Quotient was then 45, putting him in the class of a moron. Sheppard lived with his parents from the time of his release from the State Hospital until he was arrested for the offense now under consideration.

After his arrest Sheppard was committed to the State Hospital for examination. Tests similar to the earlier ones established an I. Q. of 59; other tests showed that he had the potential capacity to do better than that. Dr. Kozberg testified that Sheppard's mental age is between nine and ten years. This witness explained that the average person's mental age is fourteen. He also explained that an adult with a mental age of ten has, owing to his years of experience, much greater capacity than a ten-year-old child. It was the opinion of Dr. Kozberg and of the psychiatric staff that Sheppard was without psychosis and was not mentally ill to the degree of legal irresponsibility.

When the evidence is in conflict it is not our province to determine issues of fact. Had the present question been submitted to the jurors they would have been justified in finding from all the evidence that Sheppard was mentally competent to refuse the offer of counsel and to narrate the details of his crime. Thus there is no reversible error as a matter of law. Upon this record that concludes our inquiry.

IV. When Sheppard was taken to jail his boots were removed for comparison with the cast that had been made. It is now contended that this procedure was a violation of Sheppard's privilege against self-incrimination, so that the boots were inadmissible. The officers' action was permissible as an incident to a lawful arrest, *Harris* v. *U. S.*, 331 U. S. 145, 91 L. Ed. 1399, 67 S. Ct. 1098 (1947), and, furthermore, there was no objection to the introduction of this evidence.

V. Appellant's remaining arguments center upon the court's action in giving this instruction:

"You are further instructed that an adult defendant with the intelligence of a child from seven to nine years of age is mentally capable of committing a crime and that mere mental weakness or the fact that one had a mind below normal does not exempt him from the responsibility and punishment for his criminal acts, unless it is shown by the preponderance of the evidence that the defendant is insane under the above instructions." This instruction is not inherently wrong. Its language is almost an exact quotation from our opinions in *Chriswell* v. *State,* 171 Ark. 255, 283 S. W. 981 (1926), and *Jones* v. *State,* 213 Ark. 863, 213 S. W. 2d 974 (1948). Perhaps some of the wording in this charge might have been improved upon, but there was no specific objection calling for a modification.

Counsel now insist that this instruction does not fully define the defense of insanity and that therefore it ought to have been accompanied by an explanation of those tests of insanity that were approved in *Bell* v. *State,* 120 Ark. 530, 180 S. W. 186 (1915). A complete answer to this contention is that the trial judge himself thought that such a companion charge would be proper; he offered to give it. Defense counsel were successful in objecting to this suggestion, their preference being to submit only the matter of Sheppard's mental deficiency as distinguished from legal insanity. Needless to say, the appellant cannot complain of a ruling that was made at the insistence of his own attorneys.

It is also argued that since this instruction was not preceded by an explanation of the legal tests of insanity the jury may have been confused by the concluding reference to "the above instructions." Apparently the challenged phrase was inserted upon the assumption that the tests would be explained. When the defense succeeded in having that explanation stricken from the court's charge the phrase in question should also have been stricken. There was, however, no request for such a deletion. Moreover, the defendant's Instruction No. 1, as modified, set forth the defendant's theory that he was of such low mentality as to be incapable of forming an intent to kill. The instruction then went on to say that

if the defendant was mentally deficient to that extent then the jury should find him innocent of the charge of first degree murder, by reason of insanity. Our point is that the court's instructions as a whole did contain an explanation of a defense of insanity. Hence the court's earlier reference to that defense was not totally irrelevant, the only inaccuracy being that the reference was to "the above instructions" instead of to "the following instructions." Had the matter been called to the court's attention by a specific objection it cannot be doubted that this trivial ambiguity would have been corrected.

We have examined every objection in the record, as is our practice in capital cases. In our opinion the trial was conducted in a manner singularly free from prejudicial error.

Affirmed.