## State v. Rojas
*[Cite as 5 AOA 1]*

*Case No. C-880332*
*Hamilton County, (1st)*
*Decided July 11, 1990*

*Arthur M. Ney, Jr., Prosecuting Attorney, and William E. Breyer, Esq., 420 Hamilton County Courthouse, Court and Main Streets, Cincinnati, Ohio 45202, for Plaintiff-Appellee.*

*Dale G. Schmidt, Esq., and Henry E. Sheldon II, Esq., 1019 Main Street, Cincinnati, Ohio 45202, for Defendant-Appellant.*

*Per Curiam.*

This cause came on to be heard upon the appeal, the transcript of the docket, journal entries and original papers from the Court of Common Pleas of Hamilton County, Ohio, the transcript of the proceedings, the briefs and the arguments of counsel.

### I.

The defendant-appellant, Martin Rojas, stands convicted of a series of criminal offenses stemming from the demise of his six-month relationship with one Rebecca Scott. Rojas first met Scott in December of 1986, while both were attending a church function. The two were drawn together in friendship by Scott's efforts to apply her devout Christian beliefs to the task of committing Rojas to what might be described as "a dedicated Christian lifestyle." Their relationship centered on the church and on turning Rojas away from the destructive aspects of a life tainted by recurring episodes of substance abuse.

The relationship started to unravel on May 13, 1987, when Rojas administered a beating to Scott, apparently as a result of his frustration over Scott's attempts to usher him toward the redemptive path. Scott's initial response was to arrange a meeting with Edna White, a reader at the Voice of Calvary Chapel, at which White joined with Scott and Rojas in conversation and prayer. Several days later, however, Scott called Rojas and told him that she was ending their relationship because the beating had convinced her of the futility of her efforts to improve Rojas's life. The final, tragic break in the relationship came on May 15,1987, at approximately 6:15 pm., when Rojas went to Scott's apartment, forced his way through the front door as she was attempting to leave, and stabbed her twice with a fishing knife. Then, as she remained conscious, bleeding from what proved to be the fatal wounds, Rojas disrobed Scott and engaged her in vaginal coition.

Rojas thereafter washed and dried his blood-stained clothing and spread a flammable liquid both on Scott's body and throughout her apartment. He then took some money from Scott's purse, turned on the gas stove, and lit candles before leaving the apartment to catch a bus for the trip back to his home. Rojas later admitted that his intent was to cause an explosion in the apartment in an effort to destroy evidence of his crimes.

Refreshed by sleep, Rojas called his mother in Denver, Colorado, the following morning and told her he had killed a woman and was preparing to come to Denver to see his child. He then picked up his paycheck, called Edna White, told her that Scott "was now with Jesus," and boarded a bus for Denver. In his telephone call to White, which was made while Rojas was still in Hamilton County, he professed as a subterfuge that he was going to end his own life by jumping into the Ohio River from a local bridge. A short time later, Scott's body was discovered in her apartment, the planned explosion having been prevented by an open window that had escaped Rojas' attention.

Upon his arrival in Denver, Rojas was apprehended by the local police and returned to Hamilton County. He admitted responsibility for the crimes by confessing to the police both in Denver and upon his return to this jurisdiction.

A seven-count indictment against Rojas was returned by the Hamilton County grand jury on June 17, 1987. Count one stated a charge of aggravated murder for the purposeful killing of Scott with prior calculation and design. Count two contained a separate charge for death-eligible aggravated murder under R.C. 2903.01(B), specifying that Rojas purposely caused Scott's death while he was also committing the offenses of rape (Specification two), aggravated robbery (Specification three) and aggravated )burglary (Specification one). Rojas was also charged with aggravated burglary (Count three), for trespassing by force, stealth and deception in Scott's apartment with the purpose to commit the felony of aggravated murder; rape (Count four), for engaging in vaginal intercourse with Scott while purposely compelling her to submit by force; aggravated robbery (Count five), for committing a theft offense (aggravated burglary) while armed with a deadly weapon; aggravated robbery (Count six), for committing a theft offense (aggravated burglary) while causing serious physical harm to Scott; and arson (Count seven), for knowingly creating a substantial risk of serious physical harm to the occupants of a multi-family dwelling by means of fire.

After various preliminary motions were heard and resolved, trial commenced before a three-judge panel of the Hamilton County Court of Common Pleas on February 1, 1988. On March 11, 1988, after taking the evidence under submission, the panel found Rojas guilty as he stood charged in all the counts and specifications of the indictment. At the ensuing mitigation hearing on May 5, 1988, the panel further found that the three aggravating circumstances demonstrated by the evidence outweighed any factors in mitigation of Rojas's punishment, and the following sentences were imposed: "for count one, life imprisonment; for count two, the death penalty; for count three, imprisonment for ten to twenty-five years, with ten years' actual incarceration; for count four, imprisonment for a term identical to that of count three; for count five, a third ten-to-twenty-five-year term of imprisonment, with ten years' actual incarceration; for count six, no penalty; and for count seven, yet another ten-to-twenty-five-year term of imprisonment, with ten years' actual incarceration."

Rojas now seeks a reversal of his convictions, advancing thirteen assignments of error for review.

## II.

The first two assignments of error are intertwined and will, therefore, be reviewed in tandem. The first is framed in these terms:

"The trial court erred in finding appellant guilty of Aggravated Robbery, as such a finding was against the manifest weight of the evidence, not proven beyond a reasonable doubt, and as such was in violation of his constitutional rights to due process under the Fourteenth Amendment of the United States Constitution and the Ohio Constitution."

And the second is:

"The trial court erred in finding appellant guilty of Aggravated Burglary, as such a finding was against the manifest weight of the evidence, not proven beyond a reasonable doubt, and as such was in violation of his constitutional rights to due process under the Fourteenth Amendment of the United States Constitution and the Ohio Constitution."

R.C. 2911.11, which defines aggravated burglary and is applicable to both the first and second assignments of error, states:

"(A)No person, by force, stealth, or deception, shall trespass in an occupied structure, as defined in section 2909.01 of the Revised Code, or in a separately secured or separately occupied portion thereof, with purpose to commit therein any theft offense, as defined in section 2913.01 of the Revised Code, or any felony, when any of the following apply:

'(1) The offender inflicts, or attempts or threatens to inflict physical harm on another;

'(2) The offender has a deadly weapon or dangerous ordnance, as defined in section 2923.11 of the Revised Code, on or about his person or under his control;

'(3) The occupied structure involved is the permanent or temporary habitation of any person, in which at the time any person is present or likely to be present.

'(4) Whoever violates this section is guilty of aggravated burglary, an aggravated felony of the first degree.'"

The aggravated-burglary statute comes into play with respect to the convictions for aggravated robbery as charged in counts five and six of the indictment, because the theft offense involved in each robbery charge was found to be aggravated burglary (count five alleged the commission of theft while Rojas had a deadly

weapon on or about his person or under his control; and count six alleged the commission of theft with the attendant infliction of serious physical harm to another). In the trial panel's judgment, the aggravated burglary underlying both robberies continued from the time of the initial trespass into the apartment until Rojas left the apartment, and Rojas had a deadly weapon (the knife used to stab Scott) under his control at all times he was within the apartment.[1]

Both parties now argue that the money taken from Scott's purse was, in reality, the theft offense underlying counts five and six. On the state of this record, however, it is plain that the taking of the money was not the trial panel's fundament in those counts. The findings of the trial court make no mention of the fact that Rojas took the money. The trial panel determined instead that an aggravated burglary was committed when, by Rojas's own confessions, he forced his way into Scott's apartment with the felonious purpose to kill Scott. According to the evidence, Rojas bought the murder weapon that very day to accomplish his purpose and had been told by Scott that' she would not allow him into her apartment, but would only talk to him at a local restaurant at a prearranged time. Rojas then stationed himself outside Scott's apartment door and waited for her to leave for the restaurant meeting. Under these circumstances, we are convinced that the theft offense of aggravated burglary was proved beyond a reasonable doubt under the standard enunciated in *State v. Eley* (1978), 56 Ohio St. 2d 169, 383 N.E.2d 132.

It therefore follows that the elements of aggravated robbery under counts five and six were also proven by the same standard. Rojas committed the underlying theft offense of aggravated burglary as demonstrated, supra, and carried the deadly weapon on his person or had it under his control throughout the episode in Scott's apartment. Further, he inflicted serious physical harm on Scott by stabbing her to death.

Rojas himself substantiated all the facts used to demonstrate the commission of aggravated robbery and aggravated burglary in his detailed confessions. The first and second assignments of error are overruled.

### Third Assignment of Error

"The trial court erred in finding appellant guilty of rape, as such a finding was against the manifest weight of the evidence, not proven beyond a reasonable doubt, and as such was in violation of his constitutional rights to due process under the Fourteenth Amendment of the United States Constitution and the Ohio Constitution. Under this assignment of error, Rojas argues that the state of the record leaves unresolved the issue of whether Scott was alive when, following the stabbing, Rojas had sexual intercourse with her. Without determining what offense would have resulted had Scott been dead at the time of the intercourse, we conclude, from the evidence in the record, that she was alive at that time. The appropriate degree of proof came, under the standard of *State v. Eley*, supra, in this instance, when Rojas clearly stated in his Hamilton County confession that Scott was alive. See T.p. 334. Appellant's third assignment of error is overruled."

### Fourth Assignment of Error

"The trial court erred to the prejudice of appellant by imposing the sentence of death on appellant in violation of his rights under the cruel and unusual punishment prohibition of the Eighth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment, in violation of his right to due course of law and to punishment not cruel and unusual under the Ohio Constitution, and in violation of the Ohio Death Penalty Statutes, in that the death penalty was imposed herein in reliance on aggravating factors, the conviction of the aggravated robbery specification, the rape specification and the aggravated burglary specification, on all of which there was insufficient evidence to establish those specifications beyond a reasonable doubt, thus infecting the statutory weighing process with aggravating circumstances that ought not to have been considered by the three judge panel, and, since there is no way to determine the amount of weight given to each of those factors by the three judge panel in making its recommendation, the death sentence herein cannot stand.Under this assignment of error, Rojas recasts and re-argues the matters contained in his first three assignments of error and assumes those claims and their concomitant death-specification applications to be valid, thus leading him to conclude that the statutory weighing process was tainted. Because the fundaments of his argument have been rejected for the reasons given in our rulings on the first three assignments of error, the fourth assignment of error must likewise fail."

### Fifth Assignment of Error

"The death penalty was applied to appellant in violation of his protection against cruel and

unusual punishment secured to him by the Eighth Amendment, and the right to due process of law and the equal protection of the laws under the Fourteenth Amendment to the Constitution of the United states, and of the corresponding provisions of the Ohio Constitution, in that the use of the same operative fact to first elevate what would be "ordinary" murder to aggravated murder, and then to capital, death-eligible aggravated murder (1) fails to narrow the capital class to those murderers for whom the death penalty is constitutionally appropriate and (2) permits the state to obtain a death sentence upon less proof in a felony murder case than in a case involving prior calculation and design, although both crimes are ostensibly equally culpable under the Revised Code."

The first of the two constitutional claims advanced by Rojas was not raised at trial and was not considered by the trial court. It is, therefore, subject to the waiver rule recognized for cases in which an asserted error has not properly been preserved for review on appeal. *State v. Awan* (1986), 22 Ohio St. 3d 120, 489 N.E.2d 277. Even if we do not hold Rojas to a waiver, he concedes that the issue presented by his first claim has been considered and rejected both by the United States supreme Court and the Ohio Supreme Court. *Lowenfield v. Phelps* (1988), 512 U.S. 636, 108 S. Ct. 546; *State v. Henderson* (1988), 39 Ohio St. 3d 24, 528 N.E.2d 1237; *State v. Byrd* (1987), 32 Ohio St. 3d 79, 512 N.E.2d 611. Because the second constitutional claim has also specifically been rejected by the Ohio Supreme Court, see *State v. Jenkins* (1984), 15 Ohio St. 3d 164, 473 N.E. 2d 264, we conclude that Rojas's fifth assignment of error has no merit.

### Sixth Assignment of Error

"The trial court erred to the prejudice of appellant by imposing the sentence of death on appellant in violation of his rights under the cruel and unusual punishment prohibition of the Eighth Amendment and the due process and equal protection clauses of the Fourteenth Amendment, in violation of his right to due course of law and to punishment not cruel and unusual under the Ohio Constitution, and in violation of the Ohio penalty statutes, in that:

"A. The sentence of death in this case was based upon the consideration of a nonstatutory aggravating factor, the nature and circumstances of the offense, which the law requires to be considered and weighed as mitigating, not aggravating.

"B. The nonstatutory aggravating factor as considered is unconstitutionally vague, resulting in there being no inherent restraint on the arbitrary and capricious infliction of the death penalty."

The claims made in Rojas's sixth assignment of error turn on whether the trial panel improperly converted the "nature and circumstances" of the offense into an aggravating circumstance, in violation of R.C. 2929.04(B)'s mandate that they be weighed against the aggravating circumstances set forth in R.C. 2929.04(A). To sustain his argument, Rojas relies on the following portion of the panel's written opinion:

"His intention from beginning to end was forcibly and without permission to enter the apartment of the victim and to kill her, motivated by anger over her rejection of him. Trial Opinion at 12."

In an earlier part of the opinion, however, the panel said this:

"The aggravating circumstances that the defendant, Martin J. Rojas, was found guilty of committing were that the aggravated murder was committed while he was committing aggravated burglary, rape and aggravated robbery ***. Trial Opinion at 10."

It is clear to us, from the passage on page ten of the opinion, that the trial panel well understood and set forth only the statutory aggravating circumstances that were properly in the case. The passage on page twelve is separately characterized by the trial panel as a reflection of its effort to describe some of the relevant evidence bearing upon the decision whether to impose the death sentence. That it had relevance to the matter of sentencing is, to us, indisputable, but it does not necessarily follow that its relevance was held to be on the side of the aggravating circumstances that were otherwise properly found to exist at that stage of the proceedings. In our view, a fair reading of the opinion as a whole discloses instead that the panel correctly considered and set forth the "nature and circumstances of this offense" under the heading or topical reference, "Mitigating Circumstances," and properly concluded that there was nothing of significant mitigating value to be gleaned from them. See *State v. Poindexter* (1988), 36 Ohio St. 3d 1, 520 N.E. 2d 568; State v. Smith (June 6, 1990), Hamilton App. No. C-880287, unreported. See Trial Opinion at 14-16. Rojas's sixth assignment of error is, accordingly, overruled.

*Seventh Assignment of Error*

"The trial court erred to the prejudice of appellant by denying appellant's challenges to the constitutionality of the death penalty and in sentencing appellant to death, for the reasons that the Ohio capital punishment statutes are unconstitutional, denying to appellant the right to due process of law and to the equal protection of the law, and the right to be free from cruel and unusual punishment secured to him by the Eighth and Fourteenth Amendments to the Constitution of the United States, and to the prohibition against cruel and unusual punishment and the guarantees of due course of law and equal protection under the Ohio Constitution, in that:

'(A)The death penalty is so totally without penological justification that it results in the gratuitous infliction of suffering, and that consequently, there is no rational state interest served by the ultimate sanction.

'(B)Both locally, statewide and nationally, the death penalty is inflicted disproportionately upon those who kill whites as opposed to those who kill blacks, and even within Hamilton County, the death penalty is selectively imposed, rendering the penalty as applied in Hamilton County arbitrary and capricious on the one hand, and the product of racial discrimination on the other.

'(C)The use of the same operative fact to first elevate what would be "ordinary" murder to aggravated murder, and then to capital, death-eligible aggravated murder permits the state (1) to obtain a death sentence upon less proof in a felony murder case than in a case involving prior calculation and design, although both crimes are ostensibly equally culpable under the Revised Code, and (2) fails to narrow the capital class to those murderers for whom the death penalty is constitutionally appropriate.

'(D)The requirement that a jury or three judge panel must recommend death upon proof beyond a reasonable doubt that the aggravating circumstances outweigh only to the slightest degree the mitigating circumstances renders the Ohio capital statutes quasi-mandatory and permits the execution of an offender even though the mitigating evidence falls just short of equipoise with the aggravating factors, with the result that the risk of putting someone to death when it is practically as likely as not that he deserves to live renders the Ohio capital process arbitrary and capricious, and, in the absence of a requirement that, before death may be imposed, aggravating factors must substantially outweigh mitigating factors, unconstitutional.

'(E)The Ohio capital statutes are constitutionally infirm in that they do not permit the extension of mercy by the jury or three judge panel even though aggravating factors outweigh mitigating factors.

'(F)The provisions of Crim. R. 11(C) (3) permitting a trial court to dismiss specifications upon a guilty plea only under the nebulous and undefined concept "in the interest of justice" (1) needlessly encourages guilty pleas and the concomitant waiver of the right to jury, to compulsory process and to confrontation and (2) reintroduces the possibility that the death sentence will be imposed arbitrarily and capriciously.

'(G)The Ohio capital sentencing scheme is unconstitutional because it provides no standard for sentencing or review at several significant stages of the process and consequently death sentences are imposed, and reviewed, without sufficient statutory guidance to juries, trial courts and reviewing courts to prevent the unconstitutional arbitrary and capricious infliction of the death penalty.'"

Rojas concedes that each branch of his constitutional attack upon Ohio's statutory scheme for death-penalty prosecutions has been considered and rejected by the Ohio Supreme Court. Our own review of the law discloses that, in *State v. Beuke* (1988), 38 Ohio St. 3d 29, 38-39, 526 N.E.2d 274, 285, the court has summarized its holdings in this fashion:

"Defendant's fourteenth proposition of law attacks the constitutionality of Ohio's statutory scheme for imposing the death penalty as violative of the Eighth Amendment. In an argument comprised of subparts (A) through (G), defendant contends the statutory death penalty scheme: (A) serves no rational state interest; (B) is inflicted disproportionately on those who kill whites as compared to those who kill blacks; (C) fails to narrow the class of death-eligible offenders, and permits the state to obtain a death sentence upon less proof in a felony-murder case than in a case involving prior calculation and design; (D) is impermissibly quasi-mandatory and should require mitigating factors to be substantially outweighed by aggravating circumstances before death is imposed; (E) is impermissible because it prevents juries from extending mercy; (F) together with Crim. R. 11(C) (3), encourages guilty pleas to avoid death; and (G) fails to provide adequate guidance to the sentencing authority.

"Each premise on which defendant relies as a basis to argue the unconstitutionality of Ohio's death penalty statute has been resolved adversely to defendant's position by this court. Most recently, these challenges were raised virtually verbatim and rejected in *State v. Steffen*, supra at 125, 31 OBR at 285-286, 509 N.E.2d at 396. We remain unpersuaded by defendant's argument. See, also, *State v. Jenkins*, supra, at 167-169, 167-171 and 177-178, 210, 191-192, 172-173, 15 OBR at 314- 315, 314-317 and 322-323, 351, 334-335, 318-319, 473 N.E.2d at 272-273, 272-275 and 279-280, 304-305, 290- 291, 275-277, addressing subparts, A,C,D,E, and G, respectively; *State v. Zuern*, supra, syllabus; and *State v. Steffen*, supra, at 124-125, 31 OBR at 284-285, 509 N.E.2d at 395-396, addressing subpart F; and generally, *State v. Maurer*, supra, at paragraph one of the syllabus, and *State v. Rogers*, supra at 176, 17 OBR at 415-416, 478 N.E.2d at 988."

Additionally, we note, with respect to the claims lettered (A), (B), and (G), that the issues raised by Rojas were not addressed at trial and are now subject to the waiver rule of *State v. Awan*, supra. Rojas's seventh assignment of error is overruled.

### Eighth Assignment of Error

"Where neither of the two [sic] aggravating circumstances which formed the basis of the death sentence is based upon legally sufficient evidence then the death sentence imposed in reliance thereon violates due process and the Eighth Amendment, and must be reversed."

We note that Rojas here refers generally to only two of the three aggravating circumstances of his conviction. Because he does not single out which two he intends to question, we consider all three (aggravated burglary, rape, and aggravated robbery) in our ruling on this assignment. Rojas's claim is essentially one that mirrors arguments he has already made about the legal insufficiency of the evidence. We have addressed these arguments in assignments of error one, two, and three, supra, and our rationale in each is collectively dispositive of this assignment. Rojas's eighth assignment of error is overruled.

### Ninth Assignment of Error

"The death sentence visited upon appellant violates the Eighth and Fourteenth Amendments in that it is disproportionately severe when compared to sentences in similar cases."

Rojas argues under this assignment that this court should compare his sentence to those imposed in cases where the death penalty was not obtained. Both this court and the Ohio Supreme Court have rejected such a claim. The statutory proportionality review in Ohio is limited to those cases in which the death penalty has been imposed. *State v. Steffen* (1987) , 31 Ohio St. 3d 111, 509 N.E.2d 383.

Rojas apparently concedes this, but he then argues that he is seeking a review under the federal constitution. This argument must be rejected because the United States Supreme Court has ruled that the federal constitution does not require a proportionality review. *Pulley v. Harris* (1984), 465 U.S. 37, 104 S. Ct. 871.

Finally, Rojas makes an attempt to compare his sentence to those of a group labeled the Hamilton County, Ohio, "Lucky Ten," who were convicted of aggravated murder in the commission of aggravated robbery, but not capitally charged, even though they were eligible for indictment on a capital offense. This argument was not raised at trial and thus was not properly preserved for review here. *State v. Awan*, supra. Furthermore, the so-called "Lucky Ten" argument has been previously considered and rejected. In Steffen, supra, the Ohio Supreme Court stated:

"No reviewing court need consider any case where the death penalty was sought but not obtained or where the death sentence could have been sought but was not."

Rojas's ninth assignment is overruled.

### Tenth Assignment of Error

"The death sentence visited upon appellant is disproportionally severe when compared to other Cases in Hamilton County in which capital sentencing decisions were made, and the court must reverse the death sentence and resentence the appellant to life."

Under this assignment of error, Rojas again argues that his death sentence is disproportionately severe when compared to others within this appellate district who were spared the death sentence for whatever reason. The first syllabus paragraph in Steffen, supra, is dispositive:

"The proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed."

Rojas's tenth assignment of error is overruled.

### Eleventh Assignment of Error

"The evidence at the penalty trial did not establish beyond a reasonable doubt that the aggravating circumstances appellant was convicted of committing outweighed the mitigating

factors beyond a reasonable doubt, and the death sentence imposed herein is contrary to law, to due process, and to the Eighth Amendment prohibition against cruel and unusual punishment, as well as the corresponding protection of the Ohio Constitution."

In this assignment of error, Rojas contends that the trial panel erroneously imposed the death sentence for the reason that the evidence of mitigating factors outweighed the evidence of aggravating circumstances. R.C. 2929.05(A) requires this court, inter alia, to review independently all the facts and other evidence, and to consider the offense and the offender to determine whether the aggravating circumstances outweigh the mitigating factors. This we have done in a later section of this opinion outlining our independent review of this matter, and our conclusions there render the eleventh assignment of error without merit.

*Twelfth Assignment of Error*

"The trial court erred in sentencing appellant, an individual with borderline intelligence, to the death penalty in violation of his constitutional guarantees against cruel and unusual punishment under United States Constitution, Eighth Amendment, as well as Ohio Constitution."

Rojas here argues that his alleged mental retardation renders his death sentence cruel and unusual punishment in violation of the United States and Ohio Constitutions.

Assuming arguendo that Rojas was borderline retarded on the I.Q. scale, we hold that such condition does not constitutionally prevent the imposition of the death sentence. The United States Supreme Court rejected Rojas's argument to the contrary in *Penry v. Lynaugh* (1989), ___ U.S. ___, 109 S. Ct. 2934:

"Not surprisingly, courts have long been reluctant to rely on the concept of mental age as a basis for exculpating a defendant from criminal responsibility. See, e.g., In re Ramon M., supra, 149 Cal.Rptr. at 394, 584 P.2d at 531; *State v. Schilling*, 95 N.J.L. 145, 148, 112 A. 400, 402 (1920); *People v. Marquis*, 344 Ill. 261, 267, 176 N.E. 314, 316 (1931), *Chriswell v. State*, 171 Ark. 255, 259, 283 S.W. 981, 983 (1926). Cf. *Pickett v. State*, 37 Ala.App. 410, 71 So.2d 102, 107 (1954). See generally Ellis & Luckasson, 53 Geo. Wash. L. Rev., at 435. Moreover, reliance on mental age to measure the capabilities of a retarded person for purposes of the Eighth Amendment could have a disempowering effect if applied in other areas of the law. Thus, on that premise a mildly

mentally retarded person could be denied the opportunity to enter into contracts or to marry by virtue of the fact that he had a "mental age" of a young child. In light of the inherent problems with the mental age concept, and in the absence of better evidence of a national consensus against execution of the retarded, mental age should not be adopted as a line-drawing principle in our Eighth Amendment jurisprudence.

In sum, mental retardation is a factor that may well lessen a defendant's culpability for a capital offense. But we cannot conclude today that the Eighth Amendment precludes the execution of any mentally retarded person of Penry's ability convicted of a capital offense simply by virtue of their mental retardation alone. So long as sentences can consider and give effect to mitigating evidence of mental retardation in imposing sentence, an individualized determination of whether "death is the appropriate punishment" can be made in each particular case. While a national consensus against execution of the mentally retarded may someday emerge reflecting the "evolving standards of decency that mark the progress of a maturing society," there is insufficient evidence of such a consensus today."

Rojas's twelfth assignment of error is overruled.

*Thirteenth Assignment of Error*

"The trial court erred in finding that the evidence constituted aggravated murder instead of the lesser included offense of murder or voluntary manslaughter."

In this final assignment of error, Rojas again attacks the weight and sufficiency of the evidence regarding his aggravated-murder conviction. We have already addressed his arguments in the first four assignments of error. There being nothing added here, our earlier rulings are dispositive. Rojas's thirteenth assignment of error is overruled.

III.

Having considered and disposed of Rojas's thirteen assignments of error, we now engage in our further statutory duty, pursuant to R.C. 2929.05(A), to review and independently weigh all the facts and other evidence disclosed in the record to determine whether the aggravating circumstances outweigh, beyond a reasonable doubt, the mitigating factors.

The three aggravating circumstances pertinent to our inquiry are those found by the trial panel to exist, as charged in the indictment, during the guilt phase of the proceedings. We have detailed the factual context of the aggravat-

ed burglary, rape, and aggravated robbery in earlier parts of this decision, so we need not repeat the facts here.

The mitigating factors are those drawn from the nature and circumstances of the offense; the history, background, and character of Rojas; and any other factors listed in R.C. 2929.04(B)(1) through (7) which exist in this case. We find from the record that there is nothing mitigating to be gleaned from these listed considerations. Indeed we find no factual mitigation in this record based upon Rojas's own unsworn statement:

"*** I knew that the only way that I would have a chance of trying to get out into society again was to persuade the doctors to believe that I was -- had a mental ill problem.

"***

"*** And I know that they have said that I have many times answered questions that even a four year old could have answered. And I said things that were, you know, completely off the wall to try to make myself look, you know, stupid or dumb.

"So the reason why I'm mentioning this is because I want the Court to understand that regardless of problems that I've had in society, none of those problems have occurred to cause me to go off on the crime that I did.

"I mean it just didn't, from my youth it didn't build all the way up and then all of a sudden, you know, explode.

"I know that the reason why I killed Becky was because she had rejected me ***.

"***

"And when I couldn't accept it, I got frustrated and I got angry and I got confused. And the next day when she called me and told me because she couldn't see me because of what had happened, I intentionally in my heart had decided then that I was going to kill her.

"***

"My only intention was to kill her because I felt that she did me wrong, by what she said, and after giving me things to hope on, you know, that she had refused to see me again.

"***

"I don't, you know, believe that the Court should have any mercy on me in giving me a lesser sentence because I didn't have no mercy on Becky when I killed her. T.p. (sentencing) 8-12."

Based on the foregoing, we conclude that the aggravating circumstances outweigh the total absence of mitigating factors beyond a reasonable doubt.

## IV.

Our concluding statutory duty is to conduct the propor-tionality review mandated by R.C. 2929.05. Limiting ourselves, in accordance with *State v. Steffen*, supra at paragraph one of the syllabus, to capital prosecutions in this jurisdiction that have resulted in the imposition of the death penalty, we hold that the sentence imposed in this case is neither excessive nor disproportionate to the penalty imposed in similar cases, and that it is the appropriate sentence.

The judgment of the court of common pleas, including the sentence of death imposed for the aggravated murder of Rebecca Scott, is hereby affirmed.

*Judgment affirmed.*

SHANNON, P.J., DOAN and UTZ, J.J.

———

[1] The trial panel did not sentence on count six, determining that count six was of similar import to count five.